Argued on demurrer to alternative writ September 7, 1967,
demurrer sustained, writ dismissed June 14, petition for
rehearing denied July 16, 1968, petition for writ of
certiorari denied by United States Supreme
Court February 24, 1969

# STATE ex rel WESTERN SEED PRODUC-TION CORPORATION, *Plaintiff, v.* CAMPBELL, *Defendant.*

442 P. 2d 215

*Wm. E. Tassock,* Portland, argued the cause for plaintiff. With him on the brief were Barzee, Leedy & Tassock, Portland.

*James A. Cox,* Ontario, and *John S. Moore,* Yakima, Washington, argued the cause for defendant. With Cox on the briefs were Yturri, O'Kief & Cox, Ontario; Ryan & Speropulos, Weiser, Idaho; and Velikanje, Moore & Countryman, Yakima, Washington.

Before PERRY, Chief Justice, and McALLISTER, SLOAN, O'CONNELL, GOODWIN, DENECKE and HOLMAN, Justices.

## GOODWIN, J.

This is an original mandamus proceeding to review the trial court's refusal to quash service of summons upon Western Seed Production Corp., an Arizona corporation. The validity of the challenged "long-arm" service, under ORS 14.035,[①] depends upon whether the originating complaint alleges the "commission of a

---

[①] ORS 14.035 "(1) Any person, firm or corporation whether or not a citizen or a resident of this state, who, in person or through an agent, does any of the actions enumerated in this subsection, thereby submits such person and, if an individual, his personal representative to the jurisdiction of the courts of this state, as to any cause of action or suit or proceeding arising from any of the following:

"(a) The transaction of any business within this state;

"(b) The commission of a tortious act within this state;

"* * * * *

"(3) Only causes of action or suit or proceedings arising from acts enumerated in this section may be asserted against a defendant in an action or suit or proceeding in which jurisdiction over such defendant is based upon this section.

"* * * * *."

tortious act within this state.". ORS 14.035(1)(b). There is no allegation of facts that constitute "the transaction of any business within this state." ORS 14.035(1)(a).

In this opinion, we will refer to the parties as they are designated in the pending damage action. The complaint therein alleges that the plaintiffs are Oregon sugar-beet growers who purchased through their local supplier seed which had been propagated by Western Seed in Arizona and then sold in Arizona to the plaintiffs' supplier. The supplier and Western Seed are both named as defendants in the damage action. Plaintiffs claim that defects in the seed caused crop losses and that because their land was occupied for one year in growing a worthless crop their property was damaged. Plaintiffs seek to hold Western Seed responsible for a breach of implied warranty and, in the alternative, on the theory of negligence. If plaintiffs have stated a cause of action on either theory, then it will be necessary to consider whether, for the purposes of "long-arm" jurisdiction, a "tortious act" has been committed within this state.

## I. IMPLIED WARRANTY

In *Price v. Gatlin*, 241 Or 315, 405 P2d 502 (1965), we held that a purchaser of a defective tractor could not hold the wholesaler, with whom he had no contract, strictly liable where the defect had resulted only in a loss of profits to the purchaser's business. In the present case, plaintiffs lost the profits they expected to derive from a normal sugar-beet crop. There was no damage to their land; there was only a loss of use thereof. The alleged damage is, therefore, essentially of the same character as that suffered in *Price v. Gatlin.*

The pending action, in the context of mandamus, is against a producer rather than against a wholesaler. But since each case involved a remote seller, there is no substantive basis on these facts for distinguishing *Price v. Gatlin*. In either situation, the question is whether a purchaser of a defective product who suffers only economic loss should be allowed to maintain an action for breach of warranty against one with whom he has had no dealings.

A buyer's interest in obtaining what he has bargained for is protected by the law of sales. Statutory sales law has recently undergone comprehensive review and revision in the Uniform Commercial Code. ORS ch 72. The code provides a scheme of warranty recovery, in which fault is irrelevant, for all types of loss resulting from "unmerchantable" products. Remedies under the code are subject to certain conditions not associated with common-law tort actions: notice of breach of warranty must be given, ORS 72.6070; remedies for breach of warranty can be limited, ORS 72.7190; certain warranties can be disclaimed, ORS 72.3160. Further, the statute of limitations for warranty actions is four years, ORS 72.7250, while in tort actions it is two years, ORS 12.110. The code is silent, however, as to privity requirements for breach-of-warranty actions. This aspect of sales law has been left to the courts in jurisdictions adopting the code. See Comment 2 to ORS 72.3130, in *Oregon's Uniform Commercial Code,* published in 1962 by the Legislative Counsel Committee.

■ Because of social pressure to compensate innocent victims of personal injuries, and because remedies for such injuries have traditionally been provided by tort law, this court has joined those which have abolished privity requirements in actions for personal in-

juries from defective products. We have assumed that such a cause of action sounds in tort and thus is unhampered by the statutory impediments to relief for breach of warranty. See *Heaton v. Ford Motor Co.*, 248 Or 467, 435 P2d 806 (1967); *Wights v. Staff Jennings, Inc.*, 241 Or 301, 405 P2d 624 (1965). Where a product is defective within the meaning of the Restatement (Second) of Torts § 402A (1965) and causes personal injury, the injured party can recover for his injuries against any seller of the defective product, without regard to such warranty notions as notice, disclaimer, or whether the warranty was express or implied.

Where the damages sought do not involve personal injury, however, this court has not yet decided to abandon the traditional remedies under the law of sales. In *Heaton v. Ford Motor Co.*, supra, a personal-injuries case, we said that products liability was a form of strict liability as formulated in the Restatement (Second) of Torts § 402A. We had no occasion then to decide, and do not now decide, whether strict liability should be imposed upon remote sellers of products which cause property damage instead of personal injury. The application of Section 402A to property damage is, in this state, an open question.

The risk that a product may not perform as it should exists in every purchase transaction. A buyer who chooses his seller with care has an adequate remedy should any warranties be breached. A buyer whose seller proves to be irresponsible will understandably seek relief further afield. But to allow a nonprivity warranty action to vindicate every disappointed consumer would unduly complicate the code's scheme, which recognizes the consensual elements of commerce. Disclaimers and limitations of certain warranties and

remedies are matters for bargaining. Strict-liability actions between buyers and remote sellers could lend themselves to the proliferation of unprovable claims by disappointed bargain hunters, with little discernible social benefit. Because the buyer and his seller will normally have engaged in at least one direct transaction, litigation between these parties should ordinarily be simpler and less costly than litigation between buyer and remote seller. For these reasons we retain the rule stated in *Price v. Gatlin,* supra: Where the purchaser of an unmerchantable product suffers only loss of profits, his remedy for the breach of warranty is against his immediate seller unless he can predicate liability upon some fault on the part of a remote seller.

■ Plaintiffs, therefore, have not stated a cause of action for breach of warranty against Western Seed, a remote seller. It follows that in the attempted statement of a warranty cause of action the plaintiffs have described no "tortious act committed within this state."

## II. NEGLIGENCE

Though no cause of action for breach of warranty has been stated against Western Seed, the plaintiffs have also alleged negligence. We must decide, therefore, whether the buyer's interest in having a product perform as it should is one that is protected against negligent invasion by a party not privy to the contract of sale. A number of cases have allowed negligence recovery against remote sellers, with fault taking the place of privity. See *Atlas Aluminum Corp. v. Borden Chemical Corp.,* 233 F Supp 53 (ED Pa 1964); *Spence v. Three Rivers Supply,* 353 Mich 120, 90 NW2d 873 (1958); *Lang v. General Motors Corp.,* 136 NW2d 805

(N Dak 1965). Cf. *Fisher v. Simon,* 15 Wis2d 207, 112 NW2d 705 (1961) (dictum, discussing homebuilder's liability to nonprivity purchaser). Closest to the facts of this case was one where recovery was allowed for crop losses resulting from negligently mislabeled seed. See *Hoskins v. Jackson Grain Co.,* 63 So2d 514 (Fla 1953).

Other courts have held either that negligence liability will not be imposed for purely economic loss or that negligence liability is limited to situations in which the loss occurred in a violent or dangerous accident. See, e.g., *Wyatt v. Cadillac Motor Car Division,* 145 Cal App 2d 423, 302 P2d 665 (1956) (dictum) (disapproved on related grounds, *Sabella v. Wisler,* 59 Cal2d 21, 377 P2d 589, 27 Cal Rptr 689 (1963)); *Trans World Airlines v. Curtiss-Wright Corp.,* 1 Misc2d 477, 148 NYS2d 284 (1955).

■ A buyer's desire to enjoy the benefit of his bargain is not an interest which tort law has traditionally been called upon to protect. It is in this tradition that we have declined, in the absence of fault, to impose upon remote sellers strict liability to insure customer satisfaction. The statutory sales law has set out a scheme of warranty liability in which the element of fault is irrelevant so long as the buyer proceeds against his seller. Fault becomes relevant where the loss of the benefit of the bargain is traceable to the negligence of a remote seller. Recovery for such negligence, because it is grounded upon fault, falls within traditional tort rules and presents no serious conflict with the statutory system of nonfault recovery under the Uniform Commercial Code.

■ Where the other elements of a negligence case are present, we see no reason why the availability of a tort remedy should depend upon whether the harm

was traumatic. The manufacturer should have a duty of exercising due care to avoid foreseeable harm to the users of his product. As stated by one writer, economic loss from defective products is "within the range of reasonable manufacturer foresight * * * [and this foreseeability] should raise at least a duty of due care unless some compelling economic or social or administrative reason dictates otherwise." Franklin, *When Worlds Collide: Liability Theories and Disclaimers in Defective Product Cases,* 18 Stan L Rev 974, 989 (1966). Not being aware of any such reasons, we hold that a complaint states a cause of action in tort when it alleges that the defendant negligently reproduced and sold seed which caused plaintiffs to lose the expected profit from their crop.

## III. FOREIGN ACT—LOCAL INJURY

Having decided that the complaint under examination alleges a cause of action in tort, it now becomes necessary to decide whether ORS 14.035 applies. The allegations, in effect, are that the defendant's negligence outside the state caused a loss inside the state.

Many courts, construing similar "long-arm" statutes, have exercised jurisdiction in the foreign-act-local-injury situation. See *Gray v. Amer. Radiator & Sanitary Corp.,* 22 Ill2d 432, 176 NE2d 761 (1961); and see cases cited in Note, *In Personam Jurisdiction over Nonresident Manufacturers in Product Liability Actions,* 63 Mich L Rev 1028, 1036-1040 (1965).

■ The Illinois rule is significant in this case because the Oregon statute was copied from the Illinois statute after the *Gray* case had been decided. When one state borrows a statute from another state, the interpretation of the borrowed statute by the courts of

the earlier enacting state ordinarily is persuasive. See *Fleischhauer v. Bilstad et al*, 233 Or 578, 379 P2d 880 (1963) (presumption that other state's interpretation is governing); *School Dist. No. 1 v. Rushlight and Co.*, 232 Or 341, 345, 375 P2d 411 (1962). And see *Vandermee v. District Court*, — Colo —, 433 P2d 335 (1967) (adopting Illinois interpretation of similar long-arm statute).

That the Illinois construction was probably intended by the Oregon legislature may be inferred from reports of the bar committee which advocated the legislation. See Levin, *The "Long Arm" Statute and Products Liability*, 4 Willamette L J 331 (1967). In New York, a long-arm statute modeled after the Illinois statute was interpreted to be inapplicable where a foreign act caused an injury in New York. See *Longines-Wittnauer v. Barnes & Reinecke*; *Feathers v. McLucas*; *Singer v. Walker*, 15 NY2d 443, 209 NE2d 68, 261 NYS2d 8 (1965) (consolidated cases). The 1966 New York legislature responded to these decisions by amending the statute so that it specifically refers to an act outside the state causing injury within the state. N.Y. Civ. Prac. Law § 302(a) (3), (McKinney Cum Supp 1967). Such a demonstration of legislative intent should not be made necessary in Oregon.

The Illinois statute was intended to exploit the outer limits of due process in aid of Illinois litigants. See Currie, *The Growth of the Long Arm: Eight Years of Extended Jurisdiction in Illinois*, 1963 U Ill L F 533. It is reasonable, therefore, to hold that a statute modeled after the Illinois statute should be interpreted in Oregon as broadly as constitutional due process will permit.

## IV. DUE PROCESS

The next question is whether due process permits an Oregon court to obtain personal jurisdiction over Western Seed in this case. The traditional rule that state jurisdiction over a person required personal service within the state has been weakened by *Internat. Shoe Co. v. Washington,* 326 US 310, 66 S Ct 154, 90 L Ed 95, 161 ALR 1057 (1945). *International Shoe* held that corporate presence within the state, by doing business there or otherwise, was not necessary for personal jurisdiction. Due process was said to require only that the individual or entity served outside the state have certain minimum contacts with it so that the maintenance of the action would not offend traditional notions of fair play and substantial justice. 326 US at 316.

In *McGee v. International Life Ins. Co.,* 355 US 220, 78 S Ct 199, 2 L Ed 2d 223 (1957), the court expanded upon the *International Shoe* doctrine to uphold California's assertion of jurisdiction over a Texas insurance company whose only contact with California consisted of soliciting the insured to buy the policy being sued upon and accepting premiums mailed from California. The court's discussion of the fairness of forcing the defendant to defend in California emphasized that burdens on foreign defendants had been lessened by modern communication and transportation advances, that California had an interest in providing a forum for its residents insured by out-of-state companies, and that because the important witnesses resided there California was the most convenient place for the trial.

In *Hanson v. Denckla,* 357 US 235, 78 S Ct 1228, 2 L Ed 2d 1283 (1958), Florida's assertion of personal

jurisdiction over a Delaware corporate trustee was invalidated as contrary to due process. The trustee's only contact with Florida was correspondence with the settlor of the trust after the settlor had moved to Florida. The court stated:

> "[Due process limitations] * * * are more than a guarantee of immunity from inconvenient or distant litigation. They are a consequence of territorial limitations on the power of the respective States * * *." 357 US at 251.

The court also observed:

> "* * * [I]t is essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws * * *." 357 US at 253.

*Hanson v. Denckla* thus adds to the fairness test of *International Shoe* an objective element: a purposeful act by the defendant. The requirement of a purposeful act by the defendant prevents the seizing by a forum of bootstrap jurisdiction based upon the unilateral act of the plaintiff.

In deciding whether due process allows the assertion of jurisdiction over an out-of-state manufacturer solely on the ground that his defective product has caused a loss within the forum state, the courts have not been unanimous. Some have held that due process is not satisfied if the only contact with the state asserting jurisdiction was an act outside the state with resultant loss within. See, e.g., *Erlanger Mills v. Cohoes Fibre Mills,* 239 F2d 502 (4th Cir 1956); *Mann v. Equitable Gas Company,* 209 F Supp 571 (ND W Va 1962); *Moss v. Winston-Salem,* 254 NC 480, 119 SE2d

445 (1961); *Hodge v. Sands Manufacturing Company,* 151 W Va 133, 150 SE2d 793 (1966).

Other cases, however, have upheld jurisdiction over out-of-state manufacturers whose products have caused losses within the forum state. See, e.g., *Vandermee v. District Court,* supra; *Andersen v. National Presto Industries,* 257 Iowa 911, 135 NW2d 639 (1965); *Gray v. Amer. Radiator & Sanitary Corp.,* supra; *Ehlers v. U. S. Heating & Cooling Mfg. Corp.,* 267 Minn 56, 124 NW2d 824 (1963); *Golden Gate Hop Ranch, Inc. v. Velsicol Chemical Corp.,* 66 Wash2d 469, 403 P2d 351 (1965).

In the cases upholding jurisdiction the controlling idea seems to be that manufacturers who seek a nationwide market for their wares ought to prepare at the same time to defend themselves in the courts of the states in which defective products may injure consumers. The idea conforms to the fairness principle of *International Shoe* as well as to the economic facts of life.

The *Hanson v. Denckla* emphasis on the defendant's act in purposefully invoking the benefit and protection of the forum's laws is satisfied where a seller undertakes to exploit the market in any state where customers may be found for his products.

> "* * * Where a defendant does business of such volume, or with such a pattern of product distribution, that he should reasonably anticipate that his product may ultimately be used in any state, he has done the act required for the exercise of jurisdiction by the state where the injured user resides * * *." *Keckler v. Brookwood Country Club,* 248 F Supp 645, 648 (ND Ill 1965).

In the case at bar, the plaintiffs have asserted that Western Seed propagated and multiplied defec-

tive seed in Arizona knowing that the seed would be planted by growers in Oregon and Idaho. Such allegations sufficiently describe conduct producing foreseeable consequences in Oregon and circumstances justifying long-arm jurisdiction in this case.

If Western Seed had established by its affidavits supporting its motion to quash that the sale out of which the pending action arose was an isolated transaction, and that Western Seed did not engage in interstate commerce, we might have a different question. See *Oliver v. American Motors Corp.*, 70 Wash2d 875, 425 P2d 647 (1967). On the record before us, however, the interstate nature of Western Seed's business is uncontradicted.

Western Seed has relied primarily on the ground that it does not do business in Oregon (a matter relevant under a different section of the long-arm statute), and upon the nature of the harm (economic loss rather than personal injury), together with the asserted fault-free nature of its conduct (growing seed), for the proposition that no tort has been committed in Oregon.

In view, however, of our analysis of the factual situation alleged in plaintiff's complaint and of the relevant law derived from the decisions which have been called to our attention in cases dealing with similar problems, we hold that the complaint does state a cause of action for negligence and a resulting loss under circumstances in which jurisdiction can be obtained under ORS 14.035(1)(b).

The demurrer to the alternative writ of mandamus is sustained, and the writ is dismissed.

O'CONNELL, J., concurring in part; dissenting in part.

With the adoption of the majority opinion it would

appear that the Oregon law of products liability can now be roughly summarized as follows:

### Personal Injury

A seller, either remote or immediate, who is negligent in selling a defective product is liable for personal injuries. Similarly, both a remote and immediate seller are liable for personal injuries resulting from the sale of an article unreasonably dangerous. In none of these instances is liability predicated upon the Uniform Commercial Code.

### Property Damage

Immediate and remote sellers are liable for property damage resulting from negligence in selling a defective product. This liability is not predicated upon the Uniform Commercial Code.

An immediate seller is strictly liable for property damage.[①] Liability may arise either upon an express or an implied warranty. The liability is predicated upon the Uniform Commercial Code.

Whether a remote seller would be strictly liable for property damage resulting from the sale of an unreasonably dangerous product is left open by the majority opinion. If the court were to recognize strict liability under these circumstances, I assume that it would be based upon Section 402A of the Restatement of Torts (Second) and not upon the Uniform Commercial Code.

### Loss of Bargain and Loss of Profits

An immediate seller is strictly liable for loss of bargain or loss of profits. Liability may arise either upon an express warranty or an implied warranty and is predicated upon the Uniform Commercial Code.

It is not clear from the opinion whether the remote

---

[①] Apparently this would include not only damage to the defective product, but also damage to other property of the purchaser caused by the defect.

seller is liable for a loss of bargain or loss of profits resulting from a breach of express warranty. He is not liable on a theory of implied warranty under the Code. The remote seller is liable for loss of bargain or loss of profits resulting from negligence in selling a defective product. This liability is not predicated upon the Uniform Commercial Code. Whether a remote seller would be strictly liable for loss of profits or loss of bargain resulting from the sale of an unreasonably dangerous product is left unresolved by the majority opinion.

The foregoing summary points up some very interesting features in our treatment of the law of products liability in this state. First, it should be noted that the law described in the summary is fashioned in part by this court and in part by the legislature under the Uniform Commercial Code. This allocation of the law-making function has been made by the court, but the basis upon which the allocation is made is not entirely clear. Thus, although the Code contains provisions which evidence a legislative purpose to deal with the liability for *personal injuries* arising out of the sale of a defective product we have, without explanation, deemed this aspect of the law of sales to fall outside of the provisions of the Code. Likewise, we have allocated to this court the function of developing the law relating to the liability for loss of bargain or loss of profits resulting from the seller's negligence and possibly from the sale of an unreasonably dangerous product. On the other hand, we have decided that the Code has pre-empted the law relating to liability for loss of bargain or loss of profits resulting from non-negligent sales by immediate sellers of defective products not unreasonably dangerous.

In the case at bar the majority attempts to explain the foregoing legislative pre-emption of the law relat-

ing to the remote seller's liability for loss of bargain or loss of profits. The explanation is very difficult to follow. It begins with the thought that buyers are aware of the risk that "a product may not perform as it should" and that by choosing their sellers "with care" buyers can obtain a warranty and thus be provided with an "adequate remedy." Although my criticism does not center here, it should be noted in passing (as it has been noted in the cases) that in the purchase of many products the buyer does not have this power to bargain for protection; if the buyer wants the product he must take it upon the terms of an "adhesion contract" designed by the seller for his own protection.[2] The court goes on to explain that to allow a non-privity *warranty* action to vindicate every disappointed consumer "would unduly complicate the code's scheme." Since the "code's scheme" is described in terms of "the consensual elements of commerce," I assume that the court is discussing liability under an *express* warranty and one which is "bargained" for between a buyer and his *immediate* seller.

The majority's analysis of the Code's provisions is unacceptable to me for a number of reasons. At the outset it should be observed that the Code was not designed to confine the buyer's warranty remedy to actions against the immediate seller. The official comment appended to the Code makes it clear that the liability of the remote seller was left for the courts to work out through case law. This is made clear in the official comment to ORS 72.3130 (the section dealing with express warranties) :

"2. Although ORS 72.3130 is limited in its scope and direct purpose to warranties made by the seller

---

[2] E.g., Henningsen v. Bloomfield Motors, Inc., 32 NJ 358, 161 A2d 69, 75 ALR2d 1, 23 (1960).

to the buyer as part of a contract for sale, the warranty sections of ORS 72.1010 to 72.7250 are not designed in any way to disturb those lines of case law growth which have recognized that warranties need not be confined either to sales contracts or to the direct parties to such a contract. * * * The provisions of ORS 72.3180 on third party beneficiaries expressly recognize this case law development within one particular area. Beyond that, the matter is left to the case law with the intention that the policies of the Uniform Commercial Code may offer useful guidance in dealing with further cases as they arise."

I read the Code to mean that the court is free to adopt a rule imposing liability upon a remote seller for the breach of an *express* warranty (whether or not the remote buyer bargained for the warranty) or for breach of an *implied* warranty, or on some other theory not couched in terms of "warranty." I believe that the drafters of the Code and the legislature did not have the fears expressed in the majority opinion that "to allow a non-privity warranty action * * * would unduly complicate the Code's scheme."

Considering first the liability of a remote seller upon an "express warranty," I assume from what the majority has written that an action upon an "express warranty" cannot be brought in Oregon against a remote seller. This I gather from the court's insistence that the liability arise out of a "consensual" transaction, that it be keyed to remedies which are "matters for bargaining" and from the observation that "actions between buyers and remote sellers would lend themselves to the proliferation of unprovable claims by disappointed bargain hunters, with little social benefit."

That this view is not compelled by the Code is

demonstrated by the case of *Seeley v. White Motor Co.*, 45 Cal Rptr 17, 403 P2d 145 (1965) decided by the California Supreme Court. In that case the court held that the remote seller was liable to a purchaser for loss of profits upon the theory of a breach of express warranty. As Mr. Justice Peters pointed out in dissent, the remote seller's liability could not have rested upon the basis of a "bargain" because the purchaser did not rely upon the warranty—he testified that he was unaware of any representation made by the remote seller.

In the present case the more serious defect in the court's analysis is the failure to consider the liability of the remote seller upon the theory of *implied* warranty. This is the very heart of the problem in this case and we should face up to it. Contrary to the majority's characterization, the Code's "scheme" is not simply to deal with liability arising out of a "consensual" exchange between seller and buyer in which the parties "bargain" with respect to the seller's liability. The Code also deals with the liability of the seller upon an *implied* warranty. That liability is not consensual. It is now pretty well agreed that liability upon an implied warranty is essentially strict liability in tort and should be dealt with on that basis.[9]

The majority opinion concedes that the purchaser can recover from the *immediate* seller for loss of profits. It is not made clear whether this liability would arise only out of an express warranty or whether it would also extend to an implied warranty. The majority opinion makes it appear that the only question is one of establishing the limits on *who* may be sued and concludes that the remote seller cannot be.

---

[9] Prosser, "The Assault Upon the Citadel" (Strict Liability to the Consumer) 69 Yale L J 1099 (1960).

The reasons given relate to notions of consensuality and bargaining and to the social benefits which flow from avoiding the "proliferation of unprovable claims" and in reducing the costs of litigation ("benefits," incidentally, which do not seem to have any significance when the court considers the liability of a non-privity defendant based upon *negligent* conduct).

The crucial question in this case is not whether liability for loss of profits should artificially be limited to immediate sellers, but whether reasons exist for holding all sellers, immediate or remote, strictly liable to a purchaser for loss of profits. If there is a policy justification for imposing strict liability then it is inappropriate to attempt to delimit the range of potential defendants according to notions of privity. To relate this more important question to the Uniform Commercial Code and its coverage, I would first ask whether an immediate seller can be liable under the Code for loss of profits.

We have held under the Sales Act that in actions by the buyer against his immediate seller for breach of an implied warranty he may recover for loss of profits.[4] I assume that the same result would be reached under the Code (ORS 72.7150). As I have previously pointed out, the liability imposed for breach of an implied warranty is simply another way of saying that there is strict liability in tort. Once the liability is identified as tortious rather than contractual in character, it is difficult to see why any distinction should be made between the liability of an immediate and a remote seller. The distinction becomes especially

---

[4] Western Feed Co. v. Heidloff, 230 Or 324, 370 P2d 612 (1962); American Oil Etc. Co. v. Foust, 128 Or 263, 274 P 323 (1929).

tenuous when the product is sold through an integrated marketing process in which the manufacturer, the distributor, and the retailer constitute, in effect, one selling organization.⑥. But even where the marketing process is not integrated, I can see no reason for making a distinction between a seller who is in privity with the buyer and a seller who is not.

As I previously indicated, it is more important that we explain why strict liability should or should not be imposed upon a seller, whether he is immediate or remote. The reason for imposing strict liability upon a seller or upon any other class of defendants is difficult to formulate. It is not enough to say, as some courts have, that the seller is liable simply because he is the better or more convenient risk bearer. As we explained in *Wights v. Staff-Jennings*, 241 Or 301, 405 P2d 624 (1965), this proves too much and would serve as well to explain why persons other than sellers should be held strictly liable for another's loss.

The rationale for imposing liability in any case ultimately calls for the acceptance of some scheme of values. Generally we look for this scheme in the norms established by the community. It is necessary to determine how these norms are to be applied in relation to the sellers of goods. Although, as Judge Learned Hand points out, these norms are "not susceptible of any quantitative estimate," they must be identified in some fashion if they are to be weighed. The law assumes that either the court or the jury, in the exercise of their respective functions, will be able to determine what these values are and to weigh them. Sometimes these values are described in terms of "moral" values

---

. ⑥ This point is developed at greater length in the dissent in Price v. Gatlin, 241 Or 315 at 329, 405 P2d 502 (1965).

with· the connotation of fault and the norm then is
the moral sense of the community.⊚ On the other hand,
they may be expressed simply in terms of social values

⊚ Professor Robert E. Keeton in "Conditional Fault in the Law
of Torts," 72 Harv L Rev 401 (1959), develops the thought that
strict liability for certain ·types of conduct involves moral fault
which he has denominated "conditional fault." It is his thesis
that one who for his own gain engages in an activity which he
knows is likely to cause loss to others should compensate those
who suffer loss resulting from the activity. "It is the moral sense
of the community that one should not engage in this type of
conduct, because of risk or certainty of loss to others, without
making reasonable provision for compensation of losses." Id. at
pp 427-28.

The thesis applied to personal injuries resulting from defective
products is stated by Cowan: "Some Policy Bases of Products Li-
ability," ·17 Stan L Rev 1077, 1088 (1965), as follows:

"Where the producer one-sidedly shifts to the consumer
a calculated risk of injury from a defective product, we may
look upon this process as a conscious expropriation of a cer-
tain valuable interest of the consumer, namely, his interest in
freedom from bodily harm.

"* * *.

"The thought which underlies this branch of the law is not
that the defendant has not conformed to norms of reasonably
careful behavior respecting his own activities that secondarily,
though perhaps inevitably, affect the life or property of an-
other. It is the fact that he has deliberately chosen to cast
his loss or the risk of loss onto another. It may be that defend-
ant was wholly innocent in his appropriation of plaintiff's in-
terest. Nevertheless, he must pay for deliberately assigning
risk of loss to another in damages appropriate to his 'wrong-
ful' conduct."

The assertion that the community senses fault or blameworthi-
ness in these cases, Keeton admits "is not demonstrable by logic.
Rather its validity is dependent upon an observation of the moral
views of the community. The appeal for the reader's agreement
with this assertion is an appeal for confirmation from his own
observations." Keeton, 72.Harv L Rev *supra,* at 435.

Another author expresses a similar view:

"* * * [I]t may be said that strict liability on retailers
comports harmoniously with contemporary ideas of fairness and
with what the buyer may reasonably expect from a modern
and highly integrated commercial world." Retailer and Manu-
facturer Liability in Germany and the United States for Per-
sonal Injury from Defective Products. ·Duke L J 94,·108 ·(1959).

unrelated to individual fault and the norm then becomes one of social efficiency in distributing and adjusting losses.

Whether we characterize the actor's conduct as innocent or blameworthy would seem unimportant. The more one studies the problem the clearer it becomes that liability "without fault" and liability "with fault" (i.e., liability for negligent, intentional conduct, etc.) are both a part of a single graduated scale of legal responsibility which measures the actor's conduct in terms of the probability of harm inherent in the conduct, the social value or utility of defendant's conduct, the social value of plaintiff's interest, and the interest of the public generally.

Plaintiff bases his claim in this case upon that aspect of implied warranty (or more properly strict liability) which permits recovery for what I have described as "innocent misrepresentation." This representation is "that the goods sold conform to the standard of quality generally attributable to goods of that description, and that they are reasonably fit for the purpose for which they are designed."[7] Since the representation is deemed to arise, not by virtue of a contract between the seller and buyer but by operation of law it may be regarded as having been made not only by the immediate seller but by the remote seller as well. Both should be liable or neither should be liable. It is not enough to say that historically only the immediate seller was held liable. Some reason must be given for perpetuating the distinction. I know of none.

In imposing liability upon the seller for breach of an implied warranty the courts have not, generally

---

[7] Price v. Gatlin, *supra,* note 5.

speaking, explained adequately the basis for implying the representation.

I attempted to do so in *Price v. Gatlin,* 241 Or 315, 319, 405 P2d 502, 504 (1965). I suggested a rationale for the imposition of liability upon the seller for loss of profits and for personal injury and property damage. There I strove to differentiate between liability based upon the innocent misrepresentation of a seller (which would require the recognition of a new tort form) and liability based upon conduct, other than the seller's representation. The distinction was imperfectly expressed,[®] but it was an effort to isolate two separate grounds for imposing strict liability upon the seller. Restated, I would impose strict liability upon a seller of a defective product for loss resulting from a representation by the seller justifiably relied upon by the purchaser.

I went on to suggest that liability could be explained even in the absence of a misrepresentation strictly defined by resting it upon the principle that a seller should not be permitted to impose an unfair "sale" upon those who are not in a position to bargain for the terms of the sale. This is just another way of ex-

---

[®] In particular, the attempt made in the Price v. Gatlin, *supra,* dissent at p 320, to distinguish between "(1) cases in which the defect causes an accident resulting in personal injury or property damage, and (2) cases in which the defect causes a pecuniary loss not arising out of an accident" has been justifiably criticized in Franklin, 18 Stan L Rev 974, pp 986-88 (1966). As Franklin points out each of the major types of· harm (personal injury, property damage, repair loss and expectational loss) may occur with or without accidents. It is further observed that "expectation loss also can be found in both accident and nonaccident situations." Finally, he adds that where the imposition of liability is justified because the consumer has been forced to purchase the product·he needs upon unfair terms designed to protect the seller, "no reason remains for differentiating accidents from nonaccidents."

pressing the general feeling of the community that one who engages in an activity for gain and who is in a position to dictate the terms of the sale should not be able to disclaim all responsibility to the victim. When either of these elements expressed in *Price v. Gatlin, supra,* is identified in a particular transaction,—i.e., reliance upon a misrepresentation or imposition of unfair terms—it is unnecessary to show that the conduct created a high risk.

On the other hand, where the emphasis is on the high probability of loss resulting from the activity, the crucial factor is not the seller's representations or superior bargaining position. Instead, as we held in *Wights v. Staff-Jennings, supra,* we apply the principle under which liability is imposed for ultrahazardous conduct, thus integrating the law relating to defective products with the law of torts generally.[9] The principle reflects the feeling in the community that

---

[9] The recognition of this process is most clearly expressed in the treatment of the law of nuisance in Restatement of Torts, § 827, p 244 (1939), where it states that in determining whether a nuisance exists the following factors are to be considered:

"(a) the extent of the harm involved;
"(b) the character of the harm involved;
"(c) the social value which the law attaches to the type of use or enjoyment invaded;
"(d) the suitability of the particular use or enjoyment invaded to the character of the locality;
"(e) the burden on the person harmed of avoiding the harm."

The same process is seen in Judge Learned Hand's well-known description of liability for failure to exercise "care," found in Conway v. O'Brien, 111 F2d 611, 612 (CCA2d 1940):

"The degree of care demanded of a person by an occasion is the resultant of three factors; the likelihood that his conduct will injure others, taken with the seriousness of the injury if it happens, and balanced against the interest which he must sacrifice to avoid the risk. All these are practically not susceptible of any quantitative estimate, and the second two are

one who deliberately chooses to engage in a type of conduct having a high risk potential should compensate the victims of that activity.

When the basis for the seller's liability for the sale of a defective product is explained by identifying and weighing the values of the community, there is no sound reason for distinguishing the liability of the immediate and remote seller. Moreover there is no reason for assuming that the Uniform Commercial Code was intended to make applicable to those two classes of sellers a different rule of liability for defective goods causing expectation losses.

SLOAN and DENECKE, JJ., join in this opinion.

---

generally not so, even theoretically. For this reason a solution always involves some preference, or choice between incommensurables, and it is consigned to a jury because their decision is thought most likely to accord with commonly accepted standards, real or fancied. * * *."

An exceptionally keen analysis of the weighing process in the area of strict liability is made by John R. Faust, Jr. in "Strict Liability in Landowner Cases," 42 Or L Rev 273 (1963).