Argued November 3, 1977, affirmed March 21, 1978

RUSSELL, *Respondent,*
*v.*
FORD MOTOR COMPANY, *Appellant.*
(TC 18999, SC P-2507)
575 P2d 1383

Ridgway K. Foley, Jr., Portland, argued the cause for appellant. With him on the briefs were Henry C. Willener and Souther, Spaulding, Kinsey, Williamson & Schwabe.

Robert S. Lovlien, Bend, argued the cause for respondent. With him on the brief were Gray, Fancher, Holmes & Hurley.

Before Denecke, Chief Justice, and Holman, Howell, Bryson, Lent, and Linde, Justices.

LINDE, J.

## LINDE, J.

■ Plaintiff recovered a judgment for damages to his pickup truck, which allegedly resulted from the fracture of a defective weld in an axle housing. The damage occurred when plaintiff lost control of the truck after it went over a bump on a gravel road, left the road, struck a rock pile, upended, and finally came to rest on its wheels. Plaintiff's initial complaint alleged negligence, strict liability, and breach of warranty, but the case went to trial on an amended complaint based solely on the strict liability of the truck manufacturer for the allegedly defective axle. The jury awarded plaintiff $2,666.97 for damages to the truck. Defendant manufacturer appeals, assigning as error the trial court's denial of its motions for an involuntary nonsuit and for a directed verdict, each based on three grounds: Failure by plaintiff to state a cause of action,[1] to demonstrate that the truck was defective when it left defendant's possession, and to establish causation.

The first of these issues requires us to fit into place another piece in the puzzle of products liability: Whether the manufacturer's strict liability for a dangerously defective product may be invoked when the only injury caused by the defect is to the product itself. Defendant contends that it may not. It characterizes damage to or destruction of the purchased product as an "economic loss" with respect to which the relations of the parties, from the manufacturer to the disappointed user, are governed by the law of sales transactions, specifically the Uniform Commercial Code. Plaintiff contends, to the contrary, that when a defective product is dangerous to persons or property, the manufacturer's strict liability extends also to the loss of the product itself. The trial court concluded in a memorandum opinion that the precise issue is left

---

[1] Defendant did not demur to the amended complaint, but the sufficiency of the complaint may be challenged by motion for an involuntary nonsuit. *See Jeffries v. Pankow,* 112 Or 439, 455, 223 P 745, *aff'd on rehearing,* 229 P 903 (1924); ORS 18.230(1)(c).

open by the prior decisions of this court, but that strict liability does reach the damage to the product under the circumstances of this case. We agree.

■ The evolution of the prior decisions was recently reviewed in *Brown v. Western Farmers Association,* 268 Or 470, 521 P2d 537 (1974). Strict liability for products that are not "ultra-hazardous," as in *Wights v. Staff Jennings, Inc.,* 241 Or 301, 405 P2d 624 (1965), but are "dangerously defective" dates from *Heaton v. Ford Motor Co.,* 248 Or 467, 435 P2d 806 (1967), a case factually very similar to the present one. "Dangerously defective" has been held to mean "unreasonably dangerous to the user or consumer or to his property." See cases cited in *Brown,* 268 Or at 477. The liability is independent of contractual privity and extends to remote buyers, users, or others foreseeably within the range of the danger created by the defective condition. This line of development addressed the standards of the manufacturer's or seller's responsibility for his product and the class of injured parties to whom he would be liable, but it did not settle the type of losses included within that liability.

■ The evolution of tort liability for defective products did not proceed without second thoughts that it threatened to swallow up the law enacted by the legislature to govern relationships in the commercial marketplace, specifically the sales provisions of the Uniform Commercial Code, ORS 72.1010-72.7250, as critics had charged. *See, e.g., Markle v. Mulholland's Inc.,* 265 Or 259, 273, 509 P2d 529 (1973) (O'Connell, C.J., concurring), and articles cited *id.* at 275 n. 4; *Brown, supra,* 268 Or at 483 (O'Connell, C.J., dissenting). The Code, as enacted in 1961, contains provisions for a buyer's recovery of damages from the seller for breaches of warranty, including consequential damages in the form of predictable business losses as well as injuries to persons or property, ORS 72.7140-72.7150, and it specifies how express and implied warranties are created, modified, or excluded, and who may rely upon them. ORS 72.3130-72.3180. Moreover,

the legislative assembly in 1973 enacted a further statute addressed specifically to the sale of consumer goods (defined to include "a new motor vehicle . . . used or bought for use primarily for personal family or household purposes"), which makes detailed provisions for the liability of manufacturers, distributors, and retailers under express or implied warranties and for the disclaimer of such warranties. ORS 72.8010-72.8200.[2] The accommodation between these enactments and the tort liability for damages caused by defective products follows no easy lines of demarcation. It is clear, of course, that the common law cannot override the statutes or deprive persons of statutory rights or remedies when these are invoked. On the other hand, the court has assumed that the statutes were not intended to be exclusive and to displace entirely the common-law principles of liability insofar as these focus on premises other than the mutual bargains or expectations of sellers and buyers in the marketplace. Indeed, the 1973 statute so provides. ORS 72.8190. The problem has been seen as one of finding some limits to the producer's strict liability for losses caused by his products. *Phillips v. Kimwood Machine Co.,* 269 Or 485, 491-492, 525 P2d 1033 (1974).

The effort to stake out a line between the tort law and the commercial law has taken various forms. A "disappointed buyer" seeking a remedy only for "economic loss" resulting from the defective performance of a product purchased for business use was left to find it in the law of sales, first as against an

---

[2]For instance, ORS 72.8070 anticipates a manufacturer's or seller's primary reliance on express warranties and disclaimers but, in their absence, provides:

(2) When with respect to sale of a consumer good to a retail buyer no express warranty is made or the duration of an express warranty is not stated, the implied warranty of merchantability or, if applicable, the implied warranty of fitness endures:

(a) Except if the good is a motor vehicle, for one year after the sale; or

(b) If the good is a motor vehicle, until expiration of one year after the sale or until 12,000 miles of use, whichever first occurs.

"innocent" seller, *Price v. Gatlin,* 241 Or 315, 405 P2d 502 (1965), and later also against a nonnegligent producer, *State ex rel Western Seed v. Campbell,* 250 Or 262, 442 P2d 215 (1968), *cert. denied,* 393 US 1093 (1969), though such a loss would be recoverable for negligence, *id.* at 269-270. Three members of the court suggested that the distinction between an "economic loss" from defective performance and "property damage" recoverable upon strict liability could be whether the defect caused an "accident," *Price v. Gatlin,* 241 Or at 320 (O'Connell, J., dissenting with Sloan and Denecke, JJ.) and then withdrew that suggestion in *Western Seed,* 250 Or at 285 n. 8 (same justices concurring and dissenting).

Meanwhile, any buyer invoking commercial law to recover for losses from a product's defective performance in the buyer's business was met by decisions retaining the requirement of privity in that context. *Id.* at 268; *Hupp Corp. v. Metered Washer Service,* 256 Or 245, 472 P2d 816 (1970), *Davis v. Homascote Co.,* 281 Or 383, 574 P2d 1116 (1978).[3] On the other hand, in cases where strict liability for a dangerously defective product was otherwise held to apply, plaintiffs were allowed to recover property damage both when the property was used in business, *Brownell v. White Motor Corp.,* 260 Or 251, 490 P2d 184 (1971),[4] and in

---

[3]The UCC did not foreclose different state rulings on the question of "vertical privity," *i.e.* the need for a contractual relationship between plaintiff and defendant in the chain of distribution. See J. White and R. Summers, Handbook of the Law Under the Uniform Commercial Code § 11-2, at 327 (1972), citing UCC § 2-318, Comment 3 (1962 version), and alternatives B and C to that section in the 1966 Official Recommendations. The court has not had occasion to decide the question in the context of goods bought for consumption rather than business use. Once past the potential defenses, a warranty plaintiff may recover "incidental" and "consequential" damages, including losses foreseeable by the seller and damages for injuries to persons and property. ORS 72.7150.

[4]The business purchaser's tort remedy for property damage from a defective product was, in turn, brought closer to the commercial law when the court decided that, at least in the business context, the seller's liability can be limited by mutual agreement. *K-Lines, Inc. v. Roberts Motor Co.,* 273 Or 242, 541 P2d 1378 (1975); *see* ORS 72.7190.

the home, *Wulff v. Sprouse-Reitz Co.,* 262 Or 293, 498 P2d 766 (1972). Finally, *Brown v. Western Farmers Association, supra,* rejected a claim for "economic loss" by a purchaser of defective chicken feed because the defect did not render the feed "unreasonably dangerous," although it threatened and caused an impairment of plaintiff's property, the chickens. A concurring opinion in *Brown* would have relegated the purchaser to the UCC because the economic injury was loss of profits and its cause was not "accidental," reviving a criterion raised in *Price v. Gatlin* and dropped in *Western Seed* above. 268 Or at 481 (Denecke, J., concurring). A dissent suggested that if we were writing on a clean slate, we might confine strict liability for dangerously defective products to injuries to the person, also reviving an earlier suggestion in *Price v. Gatlin.* 268 Or at 485 (Holman, J., dissenting).

Starting with a clean slate, an argument can also be made that recovery for repair or replacement of the defective product itself must be pursued under the commercial law and not under a tort theory of strict liability. If the defective product has done no other damage, what plaintiff has lost is part or all of what he bought, and his rights toward his immediate or remote seller are normally governed by contractural and statutory provisions. But when the defective product has damaged or destroyed other property besides the product itself, as in *Wulff v. Sprouse-Reitz Co., supra,* segregation of the claims seems artificial. And the slate is not clean, since the court in fact allowed a strict liability claim for loss of the defective product itself in *Brownell v. White Motor Corp., supra.* So the *Brown* court, having found no "unreasonable danger" to "property" in the mere impairment of the commercial value of the property in that case, only acknowledged that perhaps strict liability should require the *danger* to be one endangering human life or safety, a

[ 593 ]

different question from whether tort recovery should be limited to such an *injury*.[5]

■ That difference determines the decision in the present case. The focus in the foregoing evolution of products liability has been on the premise for the seller's responsibility beyond warranty or negligence, though the motivating concern was with injuries to personal health. This premise of responsibility has settled on strict liability for marketing the dangerously defective product, a premise stricter than negligence but less than absolute liability. *Markle v. Mulholland's, Inc., supra,* 265 Or at 265-268; *Phillips v. Kimwood Machine Co., supra,* 269 Or at 491. Had it been absolute liability, making an enterprise an insurer against harm caused by its products, the focus in delimiting this remedy would have been on the characteristics of the plaintiff and his injury rather than on those of the defendant and his product. It has, however, been on the latter. Insofar as the premise of responsibility for the marketing of a dangerously defective product states a norm for the producer and seller, that norm either has or has not been met at the time the product is sold. Whether the seller has met this responsibility cannot depend on the fortuitous extent of the damage done when the danger created by the defect subsequently comes to pass. Moreover, if a plaintiff is able to trace the damage to the seller's negligence, he may recover for economic losses of a kind that the seller should have been able to foresee. *State ex rel Western Seed v. Campbell, supra,* 250 Or at 269-270. Since plaintiffs are likely to predicate their actions on allegations both of negligence and of product defects, a substantial difference in the scope of recovery would create complications in instructing the

---

[5] Section 402A of the Restatement of Torts 2d, the source most cited in Oregon cases since *Heaton v. Ford Motor Co., supra,* would extend strict liability for product defects unreasonably dangerous to property as well as to persons. *See Brown v. Western Farmers Association, supra,* 268 Or at 476-478. Assuming that unreasonable danger to property suffices to impose strict liability for marketing a defective product, we proceed on the premise that this danger must be to property other than the product itself.

[ 594 ]

jury on the different measure of damage that would be allowable under each theory, complications that do not seem justified by underlying differences in the bases of defendant's responsibility.

■ Nevertheless, this does not imply that once a product is "dangerously defective," its seller is liable for any and all losses consequent upon its use. The premise of his liability also controls its extent. The loss must be a consequence of the kind of danger and occur under the kind of circumstances, "accidental" or not, that made the condition of the product a basis for strict liability. This distinguishes such a loss from economic losses due only to the poor performance or the reduced resale value of a defective, even a dangerously defective, product. It is the distinction between the disappointed users in *Price* and *Brown,* and the endangered ones in *Brownell v. White Motor Corp.* and *Wulff v. Sprouse-Reitz Co.* It may not be the sole or the final distinction between the responsibilities of sellers in tort and in commercial or other statutory law. The legislature has addressed the character and scope of consumer protection in the market place before[6] and it may do so again. But this distinction marks the evolution of the law in Oregon to date.

■ In this case the conditions for recovery are met. If the alleged defect in the truck axle housing existed, it was certainly a man-endangering one. The property for which damages are claimed, the truck, was assertedly wrecked in consequence of precisely the defective condition, and under the circumstances, that made the product dangerous to the user. When a defective axle assembly causes a truck to leave the road and turn over, even if by good fortune no person or other property is injured, the damage to the truck itself results from just the kind of danger for which the

---

[6]Besides the UCC and ORS 72.8010-72.8200, see, also, ORS 30.900-30.915, which governs some aspects of products liability actions accruing after December 31, 1977, ORS 83.010-83.990, which deals with retail installment sales, and ORS 646.605-646.656, the Unlawful Trade Practices Act.

responsibility for defective products is imposed on the seller. The trial court did not err in holding that plaintiff had stated a cause of action for strict liability.

■ Defendant's second and third ground for its motions were that there was no substantial evidence to support plaintiff's allegations that the truck was dangerously defective when it left the manufacturer's possession and that the defect caused the accident. Plaintiff's case rested on the evidence of two witnesses, plaintiff himself and an engineer called and qualified as an expert. The expert testified to the results of a metallurgical examination that indicated a defective weld where the axle housing broke. He stated that the defect would cause the steel of this part to be brittle and "weakened" so as to break "at loads that one would normally expect the piece to be able to sustain" and "when you simply wouldn't expect it to break if those had not been there." The engineer could not, from mere examination of the broken housing, exclude the possibility that the break occurred after rather than before the truck left the road and struck the rock pile. However, plaintiff, himself, testified that he drove at a moderate speed over two bumps that on previous occasions had not caused any problems, and that after about 30 feet he felt the front end of the truck "give out" and drop to the left, after which the truck swerved and eventually hit the rock pile. This evidence sufficed to permit the jury to consider it more probable than not that the accident was caused by the fracture of the axle housing under a stress that a properly welded assembly would have withstood.

■ Nor did the trial court err in letting the jury decide whether the weld described by plaintiff's witness was a weld made in manufacturing the truck. The evidence, not questioned by defendant, was that the vehicle was a 1973-model Ford pickup purchased from a Ford dealer some six or seven months before the date of the accident, December 30, 1972. Even allowing generously for the difference between the Gregorian calendar and the one employed in Detroit, a jury might

well infer that plaintiff had acquired the truck as a new product when no question was raised about this. The relation between the plaintiff's burden of persuasion on the absence of intervening changes in the product after it left defendant's hands and defendant's obligation to trigger the need for proving such a negative has been described by one court as follows:

> To be sure, there are reasons for requiring the defendant to carry the burden of coming forward and alleging a substantial change. In many cases, the alleged substantial change is perceived only by the defendant who should, therefore, have to allege it and maintain the burden of going forward with the evidence on the point. The plaintiff is accordingly put on notice to try to prove no substantial changes were made. And as a general rule, rather than requiring a plaintiff to negate an infinite number of possible changes, it seems more reasonable and in keeping with our adversary process to expect the defendant to allege the substantial changes he expects a plaintiff to try to disprove. But once the defendant has come forward, we believe that the burden of proof (or again, more precisely, the risk of non-persuasion) must remain with the plaintiff; if the scales remain in equilibrium on the point, plaintiff is the loser. *Southwire Co. v. Beloit Eastern Corp.,* 370 F Supp 842, 857-858 (ED Pa 1974).

In the present case nothing would suggest that the part at issue, the axle assembly, would be one which under normal circumstances would be altered, replaced, or even serviced in the chain of distribution or during the 7,000 miles that plaintiff drove the truck.[7] Of course, a plaintiff could be made to testify as part of his case-in-chief that he had not himself worked on, or had someone else work on, the allegedly defective product and to try to obtain such testimony from the dealer, but we agree with the view quoted above that it would be unreasonable to require a plaintiff to negate

---

[7]The present facts differ substantially from those in *Quirk v. Ross,* 257 Or 80, 88, 476 P2d 559 (1970), which concluded that "[a]fter two owners, innumerable servicings, and 39,500 miles of use free from brake difficulties except for the last few miles, no inference can be drawn that a defect existed in the brakes at the time of the vehicle's manufacture . . . ."

all other possible explanations of the defect when no such possibility has been raised by defendant.

Affirmed.