ration; Marubeni America Corp., a New York Corporation; Mitsubishi International Corp., a New York Corporation; Mitsui and Co. (U.S.A.) Inc., a New York Corporation; Nichimen Co., Inc., a New York Corporation; Nissho–Iwai American Corp., a New York Corporation; Sumitomo Corporation of America, a New York Corporation; C. Itoh and Co., Ltd., a Japanese Corporation; Kanematsu–Gosho, Ltd., a Japanese Corporation; Marubenie Corp., a Japanese Corporation; Mitsubishi Corp., a Japanese Corporation; Mitsui and Co., Ltd., a Japanese Corporation; Nichimen and Co., Ltd., a Japanese Corporation; Nissho–Iwai Co., Ltd., a Japanese Corporation; Sumitomo Shoji Kaisha, Ltd., a Japanese Corporation; Toyomenka (America) Inc., a New York Corporation; Toyo Menka Kaisha, Ltd., a Japanese Corporation; Nippon Steel Corp., a Japanese Corporation; Nippon Steel USA, Inc., a New York Corporation; Tokai Steel Works, Ltd. (Tokai Kogyo K. K.), a Japanese Corporation; Toshin Steel Co., Ltd. (Toshin Seiko K. K.), a Japanese Corporation; Tokyo Tekko Co., Ltd., a Japanese Corporation; Tokyo Steel Mfg. Co., Ltd. (Tokyo Seitetsu K. K.), a Japanese Corporation; Sanko Steel Works Co., Ltd. (Sanko Seiko Co., Ltd.), a Japanese Corporation; defendants.

Civ. A. No. 78–875–RE.

United States District Court,
D. Oregon.

Aug. 28, 1980.

**CASCADE STEEL ROLLING MILLS, INC., an Oregon Corporation, Plaintiff,**

**v.**

**C. ITOH AND CO. (AMERICA) INC., a New York Corporation; Kanematsu–Gosho (U.S.A.), Inc., a New York Corpo-**

832

Bruce M. Hall, Peter F. Stoloff, Susan E. Watts, Daniel M. Ricks, Bruce MacGregor Hall, P. C., Portland, Or., Willard L. Cushing, Cushing, Johnstone & Peterson, P. C., McMinnville, Or., for plaintiff.

Donald W. McEwen, Hardy, McEwen, Newman, Faust & Hanna, Portland, Or., Margaret K. Pfeiffer, Michael M. Maney, Sullivan & Cromwell, Washington, D. C., for defendants Nippon Steel USA, Inc., Nippon Steel Corp.

Barnes H. Ellis, Gregory R. Mowe, Stoel, Rives, Boley, Fraser & Wyse, Portland, Or., for defendants Nissho–Iwai American Corporation, Nissho–Iwai Co., Ltd.

Donald J. Friedman, E. Sean Donahue, Black, Kendall, Tremaine, Boothe & Higgins, Portland, Or., for defendant Sanko Steel Works Co., Ltd.

Jack L. Kennedy, Garr M. King, Kennedy, King & McClurg, Portland, Or., for defendants Sumitomo Corporation of America, Sumitomo Shoji Kaisha, Ltd.

Gordon F. Hampton, Finley L. Taylor, Carlton A. Varner, Sheppard, Mullin, Richter & Hampton, Los Angeles, Cal., Norman A. Stoll, Stoll & Stoll, Portland, Or., for defendant Tokyo Steel Mfg. Co., Ltd.

William B. Crow, M. Christie Helmer, Miller, Nash, Yerke, Wiener & Hagen, Portland, Or., Harold Baer, Jr., Guggenheimer & Untermyer, New York City, for defendants Toyo Menka Kaisha, Ltd., Toyomenka (America) Corp.

Wayne Hilliard, James H. Clarke, Spears, Lubersky, Campbell & Bledsoe, Portland, Or., for defendants Marubeni American Corporation, Marubeni Corp.

James R. Moore, Thomas M. Triplett, Souther, Spaulding, Kinsey, Williamson & Schwabe, Portland, Or., John K. Hart, Robert H. Takeuchi, Kindel & Anderson, Los Angeles, Cal., for defendants C. Itoh & Co. (America) Inc., C. Itoh & Co., Ltd.

William P. Buren, John G. Holden, Wood, Tatum, Mosser, Brooke & Holden, Portland, Or., Patrick H. Sullivan, James S. Morris, Whitman & Ransom, New York City, for defendants Kanematsu–Gosho (U.S.A.), Inc., Kanematsu–Gosho, Ltd.

Terry W. Baker, Barbee B. Lyon, Tonkon, Torp & Galen, Portland, Or., Malcolm T. Dungan, Brobeck, Phleger & Harrison, San Francisco, Cal., Alvin L. Kassel, Alan J. Neuwirth, Rathheim, Hoffman, Kassel & Silverman, New York City, Oliver F. Green, Jr., Robert G. Lane, Paul, Hastings, Janofsky & Walker, Los Angeles, Cal., for defendants Mitsubishi International Corporation, Mitsubishi Corp.

Gerson F. Goldsmith, Goldsmith, Siegel & Engel, Portland, Or., Mark R. Steinberg, O'Melveny & Myers, Los Angeles, Cal., for defendants Mitsui & Co. (U.S.A.), Inc., Mitsui & Co., Ltd.

Barry E. Cohen, Paul H. Friedman, Arter Hadden & Hemmendinger, Washington, D. C., Paul R. Duden, Tooze, Kerr, Marshall &

Shenker, Portland, Or., for defendants Nichimen Co., Inc., Nichimen Co., Ltd., Tokai Steel Works, Ltd., Toshin Steel Co., Ltd., Tokyo Tekko Co., Ltd.

REDDEN, District Judge:

Plaintiff, Cascade Steel Rolling Mills, Inc. (Cascade Steel), brought this antitrust action alleging violations of the Sherman Act, 15 U.S.C. §§ 1 and 2, the Clayton Act 15 U.S.C. § 13(a), the Wilson Tariff Act, 15 U.S.C. § 8, and the Antidumping Act, 15 U.S.C. § 72. Defendants are Japanese corporations, and in some instances their American subsidiaries,[1] engaged in the manufacture, importation, and sale of steel products.

Ten defendants move to dismiss for improper venue, lack of personal jurisdiction and inadequate service of process.[2] Three of the moving defendants are Japanese trading companies, five are Japanese "mini–mill" steel manufacturers, and the remaining two consist of the largest steel producer in the world and its American subsidiary.

This opinion will set forth the applicable legal standards, and their impact on each of the moving defendants.

*DISCUSSION*

While many of the same factors are relevant to the issues of venue and personal jurisdiction, the legal standards are different. Venue has traditionally been based on the convenience of the parties; personal jurisdiction relates to the court's power to exercise control over the parties. *Neirbo Co. v. Bethlehem Shipbuilding Corp.*, 308 U.S. 165, 167–68, 60 S.Ct. 153, 154, 84 L.Ed. 167 (1939).

*Venue*

■ Venue statutes are generally intended to protect a defendant from being forced to defend an action in an unfair or inconvenient forum chosen by the plaintiff. *Leroy v. Great Western Corporation*, 443 U.S. 173, 99 S.Ct. 2710, 61 L.Ed.2d 464 (1979). By contrast, the special venue statutes in the antitrust laws are designed primarily for the convenience of the plaintiff. *United States v. National City Lines*, 334 U.S. 573, 68 S.Ct. 1169, 92 L.Ed. 1584 (1948).

Under section 12 of the Clayton Act, 15 U.S.C. § 22,[3] an antitrust action may be brought in any district in which a corporate defendant is an inhabitant, is found, or transacts business. Section 12 expanded on Section 7 of the Sherman Act, which had limited venue to districts where the defendant "resides or is found." The purpose of expanding section 7 was to remove the "often insuperable obstacle" of requiring plaintiffs to seek redress for their injuries in distant districts. *Eastman Kodak Co. v. Southern Photo Co.*, 273 U.S. 359, 374, 47 S.Ct. 400, 403, 71 L.Ed. 684 (1927).

In *Eastman Kodak*, the Supreme Court stated that "[a] corporation is engaged in transacting business in a district, within the meaning of this section ... if in fact, in the ordinary and usual sense it 'transacts business' therein of any substantial character." 273 U.S. at 373, 47 S.Ct. at 403.

■ In *United States v. Scophony Corporation*, 333 U.S. 795, 68 S.Ct. 855, 92 L.Ed. 1091 (1948), the Court observed that Section

---

1. C. Itoh & Co., Ltd.; C. Itoh & Co. (America) Inc.; Kanematsu–Gosho, Ltd.; Kanematsu–Gosho (U.S.A.) Inc.; Marubeni Corp.; Marubeni American Corp.; Mitsubishi Corp.; Mitsubishi ·International Corp.; Mitsui & Co., Ltd.; Mitsui & Co. (U.S.A.) Inc.; Nichimen & Co., Ltd.; Nichimen Co., Inc.; Nissho–Iwai Co., Ltd.; Nissho–Iwai American Corp.; Sumitomo Shoji Kaisha, Ltd.; Sumitomo Corporation of America; Toyo Menka Kaisha, L'td.; Toyomenka (America), Inc.; Nippon Steel Co.; Nippon Steel U.S.A., Inc.; Tokai Steel Works, Ltd.; Toshin Steel Co., Ltd.; Tokyo Tekko Co., Ltd.; Tokyo Steel Mfg. Co., Ltd.; Sanko Steel Works Co., Ltd.

2. Kanematsu–Gosho, Ltd.; Nichimen & Co., Ltd.; Nissho–Iwai Co., Ltd.; Nippon Steel Co.; Nippon Steel U.S.A., Inc.; Tokai Steel Works, Ltd.; Toshin Steel Co., Ltd.; Tokyo Tekko Co., Ltd.; Tokyo Steel Mfg. Co., Ltd.; Sanko Steel Works Co., Ltd.

3. Plaintiff also asserts venue under other antitrust provisions. Since Section 12 is the broadest of these, this opinion will not include a discussion of the others.

12, as construed in *Eastman Kodak, supra,* had "substantially removed the serious obstacles and practical immunities to suit which had grown up under Section 7 of the Sherman Act", and "made effective Congress' remedial purpose". 333 U.S. at 810, 68 S.Ct. at 863. Transacting business means a "practical, nontechnical business standard". *Id.* The Court rejected "atomizing [an enterprise] into minute parts or events, . . . by the process sometimes applied in borderline cases, involving manufacturing and selling activities."[4] *Id.* at 817, 68 S.Ct. at 866. The courts must consider the totality of a defendant's conduct. *See, e. g., Dobbins v. Kawasaki Motors Corp., U.S.A.,* 362 F.Supp. 54, 64 (D.Or. 1973); *Zenith Radio Corporation v. Matsushita Electric Industrial Co., Ltd.,* 402 F.Supp. 262, 321 (E.D.Pa.1975). *Scophony* precludes separate findings on whether each of plaintiff's factual allegations constitutes transacting business for venue purposes.[5]

### Personal Jurisdiction

■ The power of a federal court to exercise control over a nonresident defendant depends on two considerations: Whether an applicable statute confers jurisdiction and whether the assertion of jurisdiction accords with the constitutional limitations of due process. *Data Disc., Inc. v. Systems Tech. Assoc., Inc.,* 557 F.2d 1280, 1286 (9th Cir. 1977). In Oregon, as in other jurisdictions with state "long–arm" statutes, the first question merges with the second. Oregon courts have interpreted the long–arm statute, ORS 14.035, to extend to the outer limits of the federal constitution. *Státe ex rel White Lumber Sales, Inc. v. Sulmonetti,* 252 Or. 121, 448 P.2d 571 (1968); *State ex rel Western Seed Production Corp. v. Campbell,* 250 Or. 262, 442 P.2d 215 (1968), *cert. denied,* 393 U.S. 1093, 89 S.Ct. 862, 21 L.Ed.2d 784 (1969).[6]

■ While the judicial trend has been to relax the constitutional standard, assertions of personal jurisdiction over nonresident defendants must comport with "traditional notions of fair play and substantial justice". *World–Wide Volkswagen Corp. v. Woodson,* 444 U.S 286, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980); *International Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945). Two principal factors are considered in determining whether exercise of the court's power will satisfy that due process standard: The significance of the defendant's contacts with the forum, and the relationship of the cause of action to those forum contacts. *Wells Fargo & Co. v. Wells Fargo Exp. Co.,* 556 F.2d 406 (9th Cir. 1977).

■ If a nonresident defendant's activities in the forum are substantial, or "continuous and systematic", service can be made in causes of action which are unrelated to those activities. *Id.* at 413; *Data Disc. Inc., supra,* 557 F.2d at 1287. If the defendant's activities are not that pervasive, the nature and quality of the forum contacts must be evaluated in relation to the cause of action. The defendant must purposefully avail himself of the privilege of conducting activities in the forum, the claim must arise out of the forum contacts, and exercise of jurisdiction must be reasonable. *Data Disc. Inc.,* 557 F.2d at 1287. *Shaffer v. Heitner,* 433 U.S. 186, 97 S.Ct. 2569, 53 L.Ed.2d 683 (1977).

■ A single contact with the forum may be sufficient if the cause of action arises from it. *McGee v. International Life Ins. Co.,* 355 U.S. 220, 78 S.Ct. 199, 2 L.Ed.2d 223 (1957). A foreign act which has an effect in the forum may also satisfy the minimum contact requirement. *Id.; Kramer Motors, Inc. v. British Leyland, Ltd.,* 628 F.2d 1175

---

4. The borderline cases include *Consolidated Textile Corp. v. Gregory,* 289 U.S. 85, 53 S.Ct. 529, 77 L.Ed. 1047 (1933); *Cannon Mfg. Co. v. Cudahy Packing Co.,* 267 U.S. 333, 45 S.Ct. 250, 69 L.Ed. 634 (1925); *People's Tobacco Co. v. American Tobacco Co.,* 246 U.S. 79, 38 S.Ct. 233, 62 L.Ed. 587 (1918).

5. Plaintiff also asserts that venue is proper under 28 U.S.C. § 1391(d).

6. ORS 14.035 is applicable since this action was filed before the passage of Oregon's Rules of Civil Procedure in 1979.

(9th Cir. 1980). "[V]ery little indeed in addition to impact in the state is required to satisfy due process." *Jones Enterprises, Inc. v. Atlas Service Corporation,* 442 F.2d 1136, 1139 (9th Cir. 1971).

The most recent case in which the Supreme Court addressed this issue is *World–Wide Volkswagen Corp. v. Woodson, supra.* In that case, the plaintiffs based their assertion of personal jurisdiction on "one, isolated occurrence . . . the fortuitous circumstances that a single Audi automobile, sold in New York to New York residents, happened to suffer an accident while passing through Oklahoma." 100 S.Ct. at 566. Plaintiffs argued that it was foreseeable that the Audi would cause injury in Oklahoma, given the uniquely mobile nature of the automobile. The Court stated that

> the foreseeability that is critical to due process analysis is not the mere likelihood that a product will find its way into the forum State. Rather it is that the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there.

*Id.* at 567. In *World–Wide,* the moving defendants were the retail dealer and wholesale distributor. The automobile's manufacturer and importer did not contest jurisdiction. The Court implied that jurisdiction would have been proper over those defendants:

> Hence if the sale of a product of a manufacturer or distributor such as Audi or Volkswagen is not simply an isolated occurrence, but arises from the efforts of the manufacturer or distributor to serve directly or indirectly, the market for its product in other States, it is not unreasonable to subject it to suit in one of those States if its allegedly defective merchandise has been the source of injury to its owner or to others. *The forum State does not exceed its powers under the Due Process Clause if it asserts per-*

*sonal jurisdiction over a corporation that delivers its products into the stream of commerce with the expectation that they will be purchased by consumers in the forum State.*

*Id.* at 567 (Emphasis added).

In *Oswalt v. Scripto, Inc.,* 616 F.2d 191 (5th Cir. 1980), the court upheld jurisdiction over a Japanese manufacturer under the Texas long–arm statute, in a products liability case. The product involved was manufactured, assembled, sold and delivered to the American distributor in Japan. Relying on *World–Wide,* the court concluded that, under the distribution arrangement, the manufacturer had every reason to believe that its product would be sold in Texas. Its conduct and connection with the forum were such that it could reasonably anticipate being haled into court there.

*Adequacy Of Service*

If venue is properly laid under Section 12, the extra–territorial service of process provisions contained in that section apply.[7] If the court has jurisdiction over the defendants under Oregon's long–arm statute, its extra–territorial service provisions similarly apply.[8] The adequacy of service of process is only an issue here if, as to any defendant, the court finds that Clayton Act venue and long–arm jurisdiction have not been established.

Despite the different legal standards applied to venue and personal jurisdiction determinations, the issues involved, particularly in antitrust cases, are virtually congruent. *Pacific Tobacco Corp. v. American Tobacco Co.,* 338 F.Supp. 842, 844 (D.Or. 1972). If venue is proper under the Clayton Act, it generally follows that the court has jurisdiction over the defendant. For that reason, courts often discuss venue first,[9] and it is appropriate to do so here.

*Trading Companies*

The trading companies moving to dismiss are Kanematsu–Gosho, Ltd. (Kanematsu),

---

7. *E. g.,* 15 U.S.C. § 22; Fed.R.Civ.P. 4(i)(1)(D).

8. ORS 15.110.

9. Victor and Hood, *Personal Jurisdiction, Venue and Service of Process in Antitrust Cases Involving International Trade; Amenability of Alien Corporations to Suit,* 46 Antitrust L.J. 1063, 1065 (1978).

Nichimen & Co., Inc. (Nichimen), and Nissho–Iwai Co., Ltd. (Nissho–Iwai). They do not maintain offices in Oregon nor are they licensed to do business here. Each of them, however, owns a subsidiary corporation which is licensed to do business and does maintain an office in Oregon.[10] Plaintiff contends that the subsidiaries' transaction of business in Oregon is attributable to their parent corporations for venue and jurisdiction purposes. Defendants contend that the formal corporate entities should be respected and that the subsidiaries' activities in Oregon cannot be attributed to the parents.

In *United States v. Scophony Corp., supra*, the Court held that, despite the formal separation between parent and subsidiary, the subsidiary's activities were attributable to· the parent for Clayton Act venue purposes, due to the parent's "continuing exercise of supervision and intervention in ... [the subsidiary's] affairs." 333 U.S. at 814, 68 S.Ct. at 865. There, the subsidiary, American Scophony, was expressly created to promote the use of Scophony inventions in the United States. Scophony not only controlled American Scophony by its stock ownership, but, by a series of contracts, exercised continuing supervision over it.

In *O. S. C. Corp. v. Toshiba America, Inc.*, 491 F.2d 1064, 1066 (9th Cir. 1974), the court refused to attribute the activities of the subsidiary corporation to its parent. There, the parent controlled the subsidiary only to the extent that the subsidiary was wholly-owned, and shared common officers with the parent. That degree of control was held to be insufficient to establish venue "in the absence of a showing that the foreign corporation in fact controlled and managed the subsidiary ..." *See also, Hayashi v. Sunshine Garden Products, Inc.*, 285 F.Supp. 632 (W.D.Wash.1967),. *aff'd sub nom., Hayashi v. Red Wing Peat Corp.*, 396 F.2d 13 (9th Cir. 1968).

Neither *Scophony* nor *Toshiba* explicitly sets forth the degree of control which must be exercised by the parent over the subsidiary before the subsidiary's activities will be attributed to the parent for venue purposes. Plaintiff contends that the corporate forms should be disregarded if the parent has the capacity to control the subsidiary; defendant contends that plaintiff must prove day–to–day control.[11]

The day–to–day control test urged on the court by the trading companies is based on *Cannon Mfg. Co. v. Cudahy Packing Co.*, 267 U.S. 333, 45 S.Ct. 250, 69 L.Ed. 634 (1925). *Cannon*, however, was not an antitrust case, nor was venue the issue. It was a breach of contract action in which the Supreme Court held that the presence of a subsidiary corporation in the state did not confer personal jurisdiction over the parent. The Court stated that the formal separation between the companies should be acknowledged by the courts, and that the degree of control exercised by the parent company had no significance in the absence of an applicable statute. *Id.* at 337, 45 S.Ct. at 251.

Here, there is an applicable statute, Section 12 of the Clayton Act, and the degree of control exercised by the parent is of crucial significance. *Scophony, supra.* Those courts which have required day–to–day control,[12] a test ultimately derived from *Cannon's* restrictive language, have largely ignored the liberalizing effect of the "transacts business" language in Section 12. The *Cannon* analysis might be appropriate if antitrust venue were still determined under Section 7 of the Sherman Act. Under the Sherman Act the Supreme Court interpreted "found" to mean "doing business". . *International Harvester v. Kentucky*, 234 U.S. 579, 34 S.Ct. 944, 58 L.Ed. 1479 (1914). The

10. The subsidiaries are Kanematsu–Gosho (U.S.A.), Inc. (K.USA), Nichimen Co., Inc. (NCI), and Nissho–Iwai American Corporation (NIAC).

11. Plaintiff has the burden of proving proper venue. *Hayashi v. Sunshine Garden Products, Inc., supra.*

12. *See e. g.; San Antonio Tel. Co. v. American Tel. & Tel. Co.*, 449 F.2d 349, 352 (5th Cir. 1974); *Williams v. Canon, Inc.*, 432 F.Supp. 376, 380 (C.D.Cal.1977).

defendants in *Eastman Kodak, supra,* and *Scophony, supra,* argued that the "transacts business" addition in the Clayton Act merely made the Supreme Court's interpretation of "found" in the Sherman Act more explicit, and did not broaden its meaning. In both cases, the Court rejected that argument. In *Scophony,* the Court rejected, as controlling, those decisions interpreting "similar requirements in application to manufacturing and selling companies." 333 U.S. at 813, 68 S.Ct. at 864.[13]

The trading companies contend that *Toshiba, supra,* mandates the strict day–to–day control test under *Cannon.* I disagree. While the Court in *Toshiba* stated that the issue in that case (venue based on the subsidiary's transaction of business) was more akin to the principles enunciated in *Cannon,* it did not decide whether *Scophony* may have broadened *Cannon,* at least for venue purposes. I believe *Scophony* has rendered *Cannon* inapplicable in antitrust venue cases; otherwise, the remedial purpose behind Section 12 of the Clayton Act would be frustrated. *Accord Zenith Radio Corp. v. Matsushita Elec. Ind. Co., Ltd.,* 402 F.Supp. 262 (E.D.Pa.1975); *Call Carl, Inc. v. B. P. Oil Corporation,* 391 F.Supp. 367 (D.Md. 1975), *aff'd.* in part, *rev'd.* in part, 554 F.2d 623 (4th Cir.), *cert. denied,* 434 U.S. 923, 98 S.Ct. 400, 54 L.Ed.2d 280 (1977); *Flank Oil Co. v. Continental Oil Co.,* 277 F.Supp. 357 (D.Colo.1967). In light of the fact that the Clayton Act venue provisions were designed to remove obstacles to the establishment of venue in antitrust cases, it would be anomalous to apply the strict *Cannon* standard here.

While I conclude that the strict *Cannon* approach urged by the trading companies is not appropriate, neither is the "capacity to control" test urged by plaintiff. In *Toshiba,* the Court spoke of control and management. Management connotes more than capacity to control. Consistent with *Scophony,* there must be significant and continuing interference in, and supervision over, the subsidiary's affairs before the formal corporate entities will be disregarded.

Although it involved jurisdiction and not venue, *Wells Fargo & Co. v. Wells Fargo Exp. Co., supra,* illustrates some of the factors to be considered in determining whether the corporate entity should be disregarded. The Court stated:

> It may also be just and equitable in some cases to treat two separately incorporated entities as one where the corporate vehicle is employed as a device by which to conduct 'continuous and systematic' activities in a state without subjecting the out–of–state corporation to the general jurisdiction of the forum.

556 F.2d at 425. The Court analyzed the "alter ego" theory in light of the test used to determine whether the corporate veil should be pierced for liability purposes. However, the undercapitalization aspect of that test was not considered relevant. Among the factors considered were:

> [W]hether the officers and directors of the two are the same; whether the subsidiary pays cash for products sold or service rendered to it by the parent; whether separate books, bank accounts, tax returns, financial statements and the like are kept; and whether the parent corporation holds the subsidiary out as an agent, either expressly or impliedly as by representing it is doing business in, or has an office in the state, when only the subsidiary is present.[14]

556 F.2d at 426 (Citations omitted).

In *Zenith Radio Corp. v. Matsushita Elec. Ind. Co., Ltd., supra,* the court listed those and some other factors as providing practical guidance in determining whether the corporate entities should be disregarded for venue and jurisdiction purposes.

---

**13.** Among the cases cited in *Scophony* interpreting "similar requirements" is *Cannon.* 333 U.S. at 813, n.23, 68 S.Ct. at 864, n.23. *See also* n.3 *supra.*

**14.** In *Wells Fargo,* the lower court concluded that, under *Cannon,* stock ownership alone was insufficient to pierce the corporate veil. The Court of Appeals remanded the case for further findings in light of these factors. It is noteworthy that the Court did not mention *Cannon* in its discussion of the "alter ego" theory.

Among the factors are: (1) Whether there is a world–wide partnership in business competition between parent and subsidiary; (2) whether the parent has the capacity to influence decisions of the subsidiary in matters having antitrust consequences (e. g., interlocking directors and officers); (3) whether there is an integrated manufacturing, sales and distribution system; and (4) whether the subsidiary is the marketing arm of the parent and shares a common marketing image (e. g., through advertising and a common trademark). *Id.* at 327–28.

The factors listed above, and any others having relevance to the issue, must be considered as a whole. The ultimate issue to be decided, both in terms of venue and jurisdiction, is whether the court can conclude that the subsidiary is merely a division or branch of the larger whole. *Wells Fargo, supra,* 556 F.2d at 425; *Chromium Industries v. Mirror Polishing and Plating,* 448 F.Supp. 544, 551 (N.D.Ill.1978).

When these factors are applied to each of the trading companies, I believe that there is justification for disregarding the corporate entities.

### Kanematsu

Kanematsu is the eighth–largest trading company in Japan.[15] K.USA is its wholly-owned subsidiary in the United States. K.USA has an office and is licensed to do business in Oregon. Approximately fifty per cent of all products, and all of the steel, sold by K.USA is obtained from Kanematsu. The steel is manufactured by Funibashi Steel Works, (a Japanese corporation wholly-owned by Kanematsu), is traded by Kanematsu to K.USA, and is sold by K.USA in the United States. Between 1975 and 1979 at least eight sales of merchant bar and rebar were made to Oregon customers through K.USA; Oregon customers are identified by name and purchase order number on products shipped from Japan to Oregon through K.USA. In advertisements Kanematsu boasts of a world–wide network of offices providing a solid foundation for international operations. The advertisements give the impression that Kanematsu

is essentially a single entity with numerous overseas offices. Furthermore, K.USA uses Kanematsu's trademark. The executive vice–president of K.USA is a director of Kanematsu, and K.USA's president is one of six managing directors of Kanematsu. Kanematsu employees are regularly rotated to its subsidiary, and Kanematsu representatives have visited K.USA in relation to Oregon customers. The two companies exchange 70 telexes daily. Don Roach, a purchasing agent for Metra Steel, an Oregon steel service center, states that Kanematsu, as well as each of the other trading companies, maintains day–to–day contact with its subsidiary regarding price and other terms of sale.

### Nichimen

Nichimen is the ninth–largest trading company in Japan. It imports many different products, including steel. NCI is its wholly–owned subsidiary in the United States, with seven branch offices, one of which is in Portland. Between 1975 and 1978 Nichimen sold a yearly average of $197,500 worth of merchant bar and rebar which ultimately found its way to Oregon. The name of the Oregon purchaser and the purchaser's order number were marked on the products before they were shipped. The steel products were not handled by Portland NCI, but by NCI's office in San Francisco. Nichimen advertisements refer to New York's NCI office as one of its "overseas offices." Nichimen also represents itself as a "global business organizer" with "overseas offices" all over the world. NCI distributes exclusively Nichimen products in the United States. The executive vice–president and president of NCI are on the Nichimen board of directors. Each of NCI's twelve directors began their careers in the Nichimen organization. Nichimen employees are rotated to NCI as needed, and in 1978 and 1979, Nichimen employees made approximately 150 visits to NCI. There are approximately 1400 telexes between Nichimen and NCI each week. NCI consults Nichimen on all of its transactions

---

**15.** There are ten major Japanese trading companies.

with United States customers. Nichimen representatives have visited Farwest Steel, an NCI customer in Oregon. Nichimen has guaranteed loans by American and Japanese banks to NCI, and both corporations maintain constant receivables balances, usually in NCI's favor.

*Nissho–Iwai*

Nissho–Iwai is the sixth–largest trading company in Japan, and is fourth in total steel sales. NIAC is its wholly–owned subsidiary in the United States. Between 1975 and 1979 Nissho–Iwai shipped $11.6 million worth of merchant bar and rebar to Oregon through NIAC. Oregon customers could, and sometimes did, request steel from a particular Japanese steel mill. The president of NIAC is executive vice–president of Nissho–Iwai. Nine officers and directors of Nissho–Iwai are, or have been, officers and directors of NIAC, six of whom were employed by both corporations at the same time. Between 1975 and 1979, 185 officers and employees of Nissho–Iwai rotated to NIAC and back again. In 1978 and 1979, twenty–one Nissho–Iwai employees, five of them from the steel department, visited Oregon. While Nissho–Iwai contends that the visits were not for business purposes, two of its Oregon customers, Metra Steel and American Steel, thought otherwise. Nissho–Iwai advertisements refer to NIAC's branch offices as "our other overseas offices." A company brochure refers to the NIAC offices as "our offices" and a response to an inquiry referred to "our New York office." The two corporations exchange frequent daily communications via telex and otherwise. As with the other trading companies, NIAC consults Nissho–Iwai on its business transactions, such as price and terms of sale. In keeping with a policy of expanding international operations, Nissho–Iwai makes capital increases to NIAC's stock at NIAC's request. NIAC submits periodic financial reports to Nis-

sho–Iwai. In 1975, Nissho–Iwai guaranteed a $2 million loan to NIAC. Nissho–Iwai also lists two Oregon banks as references on its annual report. Finally, NIAC uses Nissho–Iwai's trademark.

■ For venue purposes, I conclude that each of the trading companies transacted business in Oregon. In each case, there was a considerable interlocking of personnel, from directors to officers and employees. While there is no indication that separate books and records were not kept, the parent corporations were closely involved in the subsidiaries' financial affairs. They strove to create an image of a single entity with numerous offices around the world to facilitate international operations. In two cases, the same trademark is used by parent and subsidiary. The parent corporations impliedly represented that they were doing business through their overseas offices. There were integrated marketing systems, with the subsidiaries in the United States principally involved in selling the products exported by the parents in Japan. In Kanematsu's case, the system was complete in that its subsidiary in Japan manufactured the steel ultimately destined for this country. The subsidiaries were in close consultation with their parent corporations on business transactions, particularly on price and terms of sale. The record, in its entirety, reveals that the parents supervised and intervened in the subsidiaries' affairs on a continuing basis. Venue is properly laid in Oregon.

■ As stated previously, where venue is proper under section 12 of the Clayton Act, the court usually has jurisdiction. Here, the trading companies have sold considerable amounts of steel in Oregon through their subsidiaries. The "alter ego" theory is applicable on the facts in this case, and on the law as stated in *Wells Fargo, supra.*[16] It is not fundamentally unfair, or

16. In a recent Ninth Circuit decision, *Kramer Motors, Inc. v. British Leyland, Ltd.*, 628 F.2d 1175, (9th Cir. 1980), the Court analyzed facts *similar* to those involved here, and concluded that, under the test stated in *Wells Fargo*, defendant was not subject to the court's jurisdiction. However, determinations of jurisdiction over the defendant are necessarily based on the particular facts in each case. I believe the parents' control here was significantly greater than the parents' control in *Kramer*. Furthermore, one factor in *Kramer* not present here is that the British Government owned ninety–five per cent of defendant.

inconsistent with due process, to subject the trading companies to the court's jurisdiction, particularly where the subsidiaries acted as, and were held out to be, mere offices of the parents. As stated in *Maryland Tuna Corporation v. MS Benares*, 429 F.2d 307, 324 (2nd Cir. 1970), "the separateness of the two corporations ... [is] artificial and contrived with the primary objective of insulating Nichimen Tokyo from ... amenability to suit in American courts." I conclude that this court has jurisdiction over the trading companies.

The adequacy of service of process on the trading companies is no longer an issue in light of the extra–territorial service provisions available to plaintiff under the Clayton Act.

### "Mini–Mill" Steel Manufacturers

The "mini–mill" steel manufacturers who have moved to dismiss are Tokai Steel Works, Ltd. (Tokai), Toshin Steel Co., Ltd. (Toshin), Tokyo Tekko Co., Ltd. (Tokyo Tekko), Tokyo Steel Mfg. Co., Ltd. (Tokyo Steel), and Sanko Steel Works Co., Ltd. (Sanko).

The steel mills do not maintain offices, nor are they licensed to do business in Oregon. Plaintiff contends, however, that venue and jurisdiction are proper because (1) the steel mills sold steel in Oregon through their agents, the trading companies, and therefore transacted business here; (2) the steel mills engaged in a conspiracy in Japan which resulted in injury to plaintiff in Oregon (the "target" theory); (3) the steel mills had direct contacts in Oregon sufficient to warrant the assertion of jurisdiction; and (4) the steel mills contemplated that steel shipped to the United States through the trading companies was destined for Oregon.

### Agency

There is no dispute that the steel mills manufactured steel which ended up in Oregon. In the normal course of business, the steel mills sold steel to the trading companies upon the receipt of mill–order sheets. The trading companies distributed the steel through their subsidiaries here. Plaintiff contends that the relationship between the steel mills and the trading companies was one of principal and agent.

In *Wells Fargo & Co. v. Wells Fargo Exp. Co., supra*, 556 F.2d at 419, the Court recognized that a corporation may act as an agent for a corporate principal so as to subject the principal to long–arm jurisdiction. An agency relationship is not established, however, unless the principal has the right to control the agent. *Meskimen v. Larry Angell Salvage Co.*, 286 Or. 87, 92, 592 P.2d 1014, 1018 (1979); *Jones v. Herr*, 39 Or.App. 937, 940, 594 P.2d 410, 412 (1979). Here, there is no evidence that the steel mills had the right to exercise control over the trading companies in any respect. The entities were separate; there were no parent–subsidiary relationships; and there is nothing in the record to suggest that the steel mills dealt with the trading companies other than at arms length.

Plaintiff's "agency" theory of venue and jurisdiction is without merit.

### The "Target" Theory

Plaintiff alleges that the trading companies, steel mills, and several Japanese trade associations and cartels conspired to cause injury to plaintiff in Oregon, and that venue and personal jurisdiction are therefore proper under the "target" theory.

The "target" theory permits a finding of "transaction of business" in the forum based on acts committed outside the forum, but targeted at some activity in the forum. *Pacific Tobacco Corp. v. American Tobacco Company, Inc.*, 338 F.Supp. 842 (D.Or.1972).

Under the "target theory," the court must first look to the pleading to see whether the plaintiff has alleged a prima facie case against the particular defendant. If so, threshold jurisdiction and venue are established, and the final determination of the question can await trial. (Citation omitted). Of course, if the plaintiff proves no case on the merits, he will be shown to have been wrong about

jurisdiction and venue, but these matters are then academic.

338 F.Supp. at 844–45.

This theory of venue and personal jurisdiction is dependent upon plaintiff prevailing on the merits. In *Piedmont Label Co. v. Sun Garden Packing Co.*, 598 F.2d 491 (9th Cir. 1979), the "co–conspirator" theory of venue and personal jurisdiction was at issue. It provided that threshold venue and personal jurisdiction are established if an absent defendant conspires with someone in the forum to commit acts allegedly injurious to plaintiff. As with the "target" theory, the "co–conspirator" theory is merits dependent. The Court rejected the theory, and in doing so, reversed an earlier widely-criticized decision, *Giusti v. Pyrotechnic Industries*, 156 F.2d 351 (9th Cir. 1946). The Court stated that, while the Clayton Act was intended to increase the possible forums open to a plaintiff in antitrust actions, it was not intended to provide plaintiff with freedom of choice in selecting venue. "The co–conspirator theory would defeat the congressional purpose by making the propriety of venue turn on the final decision on the merits in conspiracy cases." 598 F.2d at 495.

*Piedmont* did not expressly overrule *Pacific Tobacco*, but its rejection of a merits dependent test to determine venue and personal jurisdiction undermines the continued vitality of *Pacific Tobacco.*

I do not believe the "target" theory is valid today, in light of *Piedmont.* Furthermore, I do not believe a defendant in an antitrust action should have to spend large sums of money, and wait until the case is decided on the merits before it is determined whether the court ever had the power to exercise personal jurisdiction in the first place.

*Direct Contacts With Forum*

Plaintiff argues that venue and personal jurisdiction are proper based on the steel mills' direct contacts with Oregon. Those contacts are as follows:

Tokai–An employee of Nissho–Iwai accompanied an Oregon steel customer to Tokai's plant in Japan; Tokai advertises in the *Japan Metal Bulletin*, which is mailed to subscribers in Oregon.

Toshin–Several Toshin employees have visited Oregon over the past four years but none of the visits involved business dealings related to this cause of action; Toshin owns twenty per cent of a company which was attempting to sell a Toshin arc process to plaintiff, and Toshin was involved in the negotiations by telex; Toshin advertises in the *Japan Metal Bulletin.*

Tokyo Tekko–In 1974, four Tokyo Tekko employees visited Los Angeles to inquire into the purchase of Southwest Steel Rolling Mills, Inc. (which subsequently became Cascade Steel). They did not come to Oregon.

Tokyo Steel–Tokyo Steel owns a subsidiary located in California, but there is no evidence of any involvement by the subsidiary in this cause of action, nor has the subsidiary had any meaningful contacts with Oregon.

Sanko–In 1973 and 1976, a Sanko employee visited Oregon; on the first occasion he accompanied representatives of C. Itoh & Co., Ltd. on a tour of plaintiff's steel mill; on the latter occasion, he viewed scrap–shredding facilities. Sanko advertised in a 1975 issue of the *Japan Metal Bulletin.*

Plaintiff alleges that other contacts occurred, but has failed to offer any evidence of such contacts.[17]

▆ Isolated visits by employees of the steel mills, which are totally unrelated to the cause of action, and advertising in magazines distributed all world–wide, are insufficient bases for the assertion of personal jurisdiction. *cf. Cascade Corp. v. Hiab–Foco AB*, 619 F.2d 36 (9th Cir. 1980). Here, there is no indication that any of the con-

---

17. *E. g.*, Plaintiff alleges that all of the steel mills bought scrap metal from an Oregon company. Plaintiff states that that fact can be inferred from the presence of a large scrap dealer in Oregon. Each steel mill, however, denies that it purchased any scrap metal from Oregon.

tacts related to the cause of action, nor were they "continuous and systematic" or "substantial." *Data Disc. Inc. v. Systems Tech. Assoc., Inc., supra*, 557 F.2d at 1287.

When the direct contacts of each steel mill are considered in their entirety, they do not amount to the transaction of business in Oregon for venue purposes, nor do they satisfy minimum contacts due process for personal jurisdiction.

*Steel Shipped to Oregon*

Plaintiff accurately states that, in many instances, the steel mills knew that steel sold to the trading companies would be shipped to Portland. The destination of the steel was often printed on mill–order sheets sent to the steel mills from the trading companies. Plaintiff therefore argues that the steel mills contemplated steel sales in Oregon and transacted business here as a result.

In *World–Wide Volkswagen Corp. v. Woodson, supra*, 100 S.Ct. at 567, the Court stated in dicta that jurisdiction may be proper if a corporation delivers products into the stream of commerce expecting them to be purchased by consumers in the forum state. By placing products in the stream of commerce a defendant may be acting so as to purposefully avail itself of the privilege of doing business in the forum state. I believe it is important, however, to determine whether the defendant initiated the business contacts in the forum, and whether defendant specially manufactured the products for shipment to the forum. *See e. g., Neptune Microfloc v. First Fla. Util.*, 261 Or. 494, 497–98, 495 P.2d 263, 264 (1972).

■ Here, the steel mills were aware of the ultimate destination of the steel sold to the trading companies, but they did not solicit sales from Oregon nor did they have any control over where the steel was to be shipped. They did not specially manufacture steel for Oregon customers. I do not believe they acted purposefully so as to avail themselves of the privilege of doing business in Oregon.

Therefore, I conclude that the "mini–mill" steel mills did not transact business in Oregon for venue purposes, and did not have the requisite minimum contacts to satisfy the due process requirements.

*Nippon Steel and Nippon USA*

Nippon Steel is a giant Japanese steel producer–the largest in the world. In 1978 it produced 31.9 million tons of steel which resulted in sales of $11.526 billion. Nippon Steel maintains branch offices in various international locations. A New York branch was opened in 1970, but closed in 1972 when Nippon USA was established.

Nippon USA is the wholly–owned subsidiary of Nippon Steel. It has offices in New York, Houston, and Los Angeles. In 1977 it realized a net profit of $94,852.65 from providing marketing assistance and information on production, import and export to Nippon Steel. Neither company maintains an office or is registered to do business in Oregon.

Plaintiff contends that Nippon USA exists solely to enable Nippon Steel to transact business in the United States, and that the corporate separateness is an illusion. Defendants dispute this interpretation of the facts. They also argue that corporate separateness is irrelevant because neither company has any significant connection with the forum for jurisdiction and venue purposes. Plaintiff raises two issues: whether the two companies are a single entity due to the control and management exercised by the parent, and if so, whether Nippon USA's activities in Oregon constitute the transaction of business for venue and jurisdiction purposes.

Nippon USA has a "service agreement" with Nippon Steel to provide "services and assistance" in connection with marketing, and to provide information on the production, marketing, and import and export of steel. The parent company executed a continuing guarantee on bank loans obtained by the subsidiary.

Nippon Steel's annual report refers to "overseas offices" in New York, Los Angeles and Houston. No attempt is made to distinguish these offices from other offices

the company maintains in its own name abroad. The same is true of promotional and technical brochures and advertising. When Oregon customers have questions about Nippon Steel products they address them to the Los Angeles office of Nippon USA. The vice–president of Nippon USA made a trip to Japan to discuss this case with "our legal department". The former president, (until June 1979), of Nippon USA is a managing director of Nippon Steel. The two companies maintain close daily contact. Between seventy and one hundred telexes and facsimiles per month are sent from the Los Angeles office to Tokyo, and an equal number are received there. Officers and high–ranking employees rotate from Japan to the United States. They normally spend three or four years here with Nippon USA before returning to Japan.

The two companies share employees; they present a common image to the world through their advertising; Nippon USA is part of an integrated system of manufacture and sale; though it performs neither function for itself, it makes it possible for Nippon Steel to market its products in the United States. Nippon Steel not only has the capacity to influence and manage the operations of its subsidiary, it does so in fact. I conclude that under the test stated in *Scophony*, Nippon Steel and Nippon USA are a single entity for venue and jurisdiction purposes.

Since Nippon Steel and Nippon USA do not have separate identities, the second question is whether Nippon USA's activities in Oregon and the business which accrued to Nippon Steel as a result of those activities constitutes the transaction of business in Oregon.

Between January 1978 and May 1979 Nippon USA representatives visited Oregon on at least nine occasions. Representatives of Nippon Steel, Nissho–Iwai American Corp. and Mitsui trading company accompanied the Nippon USA representatives on some of these visits. While in Oregon they visited Oregon customers of the trading companies, and discussed prices with at least two of them. On some of these trips Nippon USA engineers provided technical services. Other trips were for "gathering general information relating to demand for steel products in the United States", to attend public hearings held by the International Trade Commission, and to attend a meeting of the Association of Steel Distributors.

It is reasonable to infer that sales of Nippon Steel products through the trading companies were not merely fortuitous, but that they resulted from the purposeful solicitation of business in Oregon by Nippon USA. When Nippon Steel put its goods into the stream of commerce it not only contemplated that the goods would be purchased in Oregon, but actively sought to serve the market here. By contrast, even though the "mini–mills" knew the destinations of their products, there is nothing in the record to show that they sought out the Oregon market, or directly solicited sales here.

Defendants argue that none of the many shipments of Nippon Steel Products included the particular products which are the subject of plaintiff's complaint, and therefore the contacts with the forum are unrelated to the cause of action. Even if that is true, the visits which occurred an average of every sixty days, and the steel business derived from the visits, were both continuous and systematic, and need not be related to the cause of action to allow the exercise of personal jurisdiction over Nippon Steel and Nippon USA.

*CONCLUSION*

Nippon Steel, Nippon USA, and the trading companies, Kanematsu, Nichimen, and Nissho–Iwai transacted business in Oregon during the time period relevant to plaintiff's cause of action, (1975–1979). Venue is proper under the Clayton Act and the assertion of jurisdiction by this court does not offend due process. The "mini–mill" steel manufacturers have not transacted business in the state for Clayton Act venue purposes not did they have sufficient minimum contacts with Oregon to warrant the exercise of jurisdiction over them.