NORTHERN POWER & ENGINEERING CORP., Appellant,

v.

CATERPILLAR TRACTOR CO., Appellee.

No. 4698.

Supreme Court of Alaska.

Feb. 6, 1981.

---

Mark S. Bledsoe, Edwards & Bledsoe, Anchorage, for appellant.

Saul R. Friedman, Hedland, Fleischer & Friedman, Anchorage, for appellee.

Before RABINOWITZ, C. J., CONNOR, BOOCHEVER,* BURKE and MATTHEWS, JJ.

## OPINION

CONNOR, Justice.

In this products liability case we are asked to determine whether the superior court erred by characterizing appellant's injury as "economic loss" rather than "property damage." This determination is necessitated by our holding in *Morrow v. New Moon Homes, Inc.*, 548 P.2d 279, 286 (Alaska 1976) that "strict liability in tort . . . does not extend to the consumer who suffers only economic loss."

The essential facts are not in dispute. In 1968, appellant, Northern Power & Engineering Corp. [Northern Power] purchased from Northern Commercial Co. [NC] a diesel powered electrical generator designed and manufactured by Caterpillar Tractor Co. [Caterpillar]. On December 13, 1973, the engine failed, resulting in severe damage to the machine but causing no additional injury to persons or property.

* This case was submitted to the court for decision prior to Justice Boochever's resignation.

In January, 1978, NC filed suit against Northern Power alleging that money was due in the amount of approximately $13,000 for services performed in the repair of the engine. In June, 1978, Northern Power was allowed to join Caterpillar as a third party defendant, alleging causes of action based on "common law" warranty, negligent breach of contract and strict products liability. Northern Power alleged that the damage was caused by failure of the low oil pressure shut down system, which caused the engine to seize when oil pressure dropped to a point insufficient to lubricate the moving parts of the machine. Caterpillar promptly moved for summary judgment.

Following full briefing and oral argument on the issues, the court granted summary judgment on all three causes of action. On the warranty cause of action the court held that, since all contracts for the sale of goods are governed by the Uniform Commercial Code, there can be no implied warranties separate and apart from that code. On the negligence cause of action the court held that a cause of action was stated but that it was barred by the two year statute of limitations applicable to "economic loss" caused by a defective product. AS 09.10.070.[1] On the strict liability cause of action the court found that the injury suffered by Northern Power constituted "economic loss" not "property damage" and,

therefore, held that damages were not recoverable on a strict liability theory.

Northern Power does not appeal the court's decision on the warranty cause of action. Nor does it dispute that a finding that the injury to the machine was "property damage" is necessary to success on its causes of action for negligence and strict liability. The sole ground upon which it appeals is that the court erred in characterizing the injury to its machine as "economic loss."

### I

Ever since the landmark decisions in *Santor v. A & M Karagheusian, Inc.*, 44 N.J. 52, 207 A.2d 305 (1965) and *Seely v. White Motor Co.*, 63 Cal.2d 9, 45 Cal.Rptr. 17, 403 P.2d 145 (1965), the case law has been divided on whether economic loss is recoverable in an action for strict products liability.[2] This split in judicial thinking is primarily a result of different attitudes as to what area of law should govern.

In *Seely*, Chief Justice Traynor applied contract principles and concluded that economic loss should remain under the jurisdiction of the law of sales as that law is defined in the Uniform Commercial Code. In essence, the *Seely* court held that where injury involves only economic loss, as where the product itself fails to function, the purchaser has merely lost the benefit of his

---

1. The court indicated that if the injury could be characterized as "property damage" a six year statute of limitation would apply. AS 09.10.-050.

2. The distinction between property damage and economic loss originated from tort concepts governing personal injury recovery. Traditionally, a manufacturer's liability in tort to a remote purchaser was limited to situations in which a dangerously defective product created an unreasonable danger of personal injury. *See MacPherson v. Buick Motor Co.*, 217 N.Y. 382, 111 N.E. 1050 (1916). Even when courts began to further extend tort liability of a remote manufacturer to liability for property damage, the initial extension was limited to defects which threatened personal injury in conjunction with damage to the product. *See e. g., Suvada v. White Motor Co.*, 32 Ill.2d 612, 210 N.E.2d 182 (1965); *Genesee County Pa-*

*trons Fire Relief Ass'n v. L. Sonneborn Sons, Inc.*, 263 N.Y. 463, 189 N.E. 551 (1934); *Marsh Wood Prods. Co. v. Babcox & Wilcox Co.*, 207 Wis. 209, 240 N.W. 392 (1932). As one commentator has noted:

"Consistency necessitated this extension because the same unreasonable dangers that had justified recovery of personal injuries caused the property damage in many of these cases. Economic loss, however, was not usually the result of the same unreasonable dangers which led to personal injury or property damage. Consequently, recovery of economic loss continued to be limited to contractual remedies."

Note, Recovery of Direct Economic Loss: The Unanswered Questions of Ohio Products Liability Law, 27 Case W.Res.L.Rev. 683, 688 n.38 (1977).

bargain. His recovery must therefore rest on warranty, not strict liability in tort.

In contrast, *Santor* extends strict liability in tort to direct economic loss. Relying on its landmark decision in *Henningsen v. Bloomfield Motors, Inc.*, 32 N.J. 358, 161 A.2d 69 (1960), the New Jersey court concluded that consumers are inherently unable to bargain at arms length with manufacturers and, therefore, cannot rely on warranty law to protect their interests. Protection can only be afforded through the creation of a tort remedy.

In Alaska, the matter was put to rest in *Morrow v. New Moon Homes, Inc.*, 548 P.2d 279 (Alaska 1976). In *Morrow*, the buyers of a mobile home sued the manufacturer for damages resulting from various defects in the product including a defective furnace, cracked windows, a leaky bathroom and a leaky roof. Because plaintiff's cause of action was premised on strict liability in tort, we reviewed the *Seely* and *Santor* decisions and concluded that *Seely* offered the preferable approach.[3]

One year later, in *Cloud v. Kit Manufacturing Co.*, 563 P.2d 248, 251 n.7 (Alaska 1977), we unanimously reaffirmed the holding in *Morrow*. In *Cloud*, which also involved dissatisfied purchasers of a mobile home, plaintiffs claimed that a polyurethane foam rug padding, which was provided to the Clouds as part of their "mobile home package" and which the Clouds stored in a crawl space beneath their mobile home, ignited, causing the mobile home to catch fire and burn. In reaching the conclusion that the resulting injury constituted "property damage," we attempted to clarify the distinction between property damage and economic loss:

> "We recognize that the line between economic loss and direct property damage is not always easy to discern, particularly when the plaintiff is seeking compensation for loss of the product itself. We

cannot lay down an all inclusive rule to distinguish between the two categories; however, we note that sudden and calamitous damage will almost always result in direct property damage and that deterioration, internal breakage and depreciation will be considered economic loss. In their attempts to distinguish between direct property damage and economic loss, the courts should be guided by the existence of, and underlying purposes for, the Uniform Commercial Code warranty actions." (footnote omitted).

*Id.* at 251. Footnote 8 of that opinion quotes the following passage from Note, Economic Loss and Products Liability Jurisprudence, 66 Colum.L.Rev. 917, 918 (1966):

> "Property damage is usually readily distinguishable from economic loss. For example, operation of a defective radiator causes property damage when it results in a fire which destroys the plaintiff's store and economic harm when it results in conditions so uncomfortable that it causes the loss of customer patronage.... If the damage is to the defective product itself, similar distinctions must be drawn. When the defect causes an accident 'involving some violence or collision with external objects,' the resulting loss is treated as property damage. On the other hand, when the damage to the product results from deterioration, internal breakage, or other non-accidental causes, it is treated as economic loss." (footnote omitted).

Relying on the above language, appellant maintains that the engine failure in this case was a "sudden and calamitous" occurrence. Appellant argues that the circumstances of the present case are analogous to the radiator-caused store fire mentioned in footnote 8, *supra*, and the flammable padding fire which destroyed the Cloud's mobile home. We disagree.

---

**3.** Although we adopted the *Seely* approach, we did so for slightly different reasons than those offered by the California court. In our view, permitting strict liability in tort for purely eco-

nomic loss would jeopardize rights granted a manufacturer under the Uniform Commercial Code. Therefore, we held that adoption of

There is nothing magical about the phrase "sudden and calamitous."[4] Our purpose in using that phrase was merely to illustrate those instances in which "property damage" is most likely to be found and, in so doing, to draw the line between those injuries which properly find their remedy in tort and those which are more appropriately governed by contract principles.[5]

Contract law has been traditionally concerned with the fulfillment of reasonable economic expectations. Tort law, on the other hand, is concerned with the safety of products and the corresponding quantum of care required of a manufacturer.[6] By distinguishing between sudden and calamitous injury on the one hand and less dramatic forms of injury on the other, *Cloud* draws the line between products which simply do not live up to their economic expectations and those which, although they did not break down in a manner which proved hazardous to persons or to other property, could foreseeably have done so. This distinction was explained in a recent Oregon case, *Russell v. Ford Motor Co.*, 281 Or. 587, 575 P.2d 1383, 1386–87 (Or.1978):

"Insofar as the premise of responsibility for the marketing of a dangerously defective product states a norm for the producer and seller, that norm either has or has not been met at the time the product is sold. Whether the seller has met this responsibility cannot depend on the fortuitous extent of the damage done when the danger created by the defect subsequently comes to pass. . . .

. . . . .

[T]his does not imply that once a product is 'dangerously defective,' its seller is liable for any and all losses consequent upon its use. The premise of his liability also controls its extent. The loss must be a consequence of the kind of danger and occur under the kind of circumstances, 'accidental' or not, that made the condition of the product a basis for strict liability. This distinguishes such a loss from economic loss due only to the poor performance or the reduced resale value of a defective, even a dangerously defective, product. It is the distinction between the disappointed users . . . and the endangered ones . . . ."[7]

such a doctrine would be contrary to legislative intent. 548 P.2d at 285–86.

4. The phrase traces its origin to *Fentress v. Van Etta Motors*, 157 Cal.App.2d Supp. 863, 323 P.2d 227 (1958). In that case, plaintiff's car was wrecked in an accident caused by negligently manufactured brakes. There was no damage to persons or other property. Although the court allowed recovery on plaintiff's negligence cause of action, it limited such recovery to situations where damage is caused by "some violence or collision with external objects not a mere marked deterioration, or even a complete ruin brought about by internal defect." Although *Fentress* has probably been disapproved to the extent that it requires collision with an external object for a finding of property damage, its foundation remains intact.

5. A "sudden and calamitous" event has never been the test of what constitutes "property damage." In *Cloud*, we merely said that "sudden and calamitous damage will almost always result in property damage . . . ." 563 P.2d at 251. Immediately preceding this statement we indicated our inability to formulate an all inclusive rule to distinguish property damage from economic loss. In light of our opinion today, we think the phrase has limited future utility.

6. According to section 402A of the Restatement (Second) of Torts, the crucial determination for recovery in strict liability is whether the product is dangerous.

7. The dangerous-nondangerous distinction has been criticized as unjustified and unworkable. *See* Ribstein, Guidelines for Deciding Product Economic Loss Cases, 29 Mercer L.Rev. 493, 500 (1978). Nevertheless, several courts have denied recovery in strict liability for economic loss solely on the ground that the products were not dangerous. *See Posttape Assoc. v. Eastman Kodak Co.*, 537 F.2d 751, 755 (3d Cir.1976); *Texsun Feed Yards, Inc. v. Ralston Purnia Co.*, 447 F.2d 660, 666–67 (5th Cir. 1971); *Brown v. Western Farmers Ass'n*, 268 Or. 470, 521 P.2d 537, 540–41 (1974); *Eli Lilly Co. v. Casey*, 472 S.W.2d 598, 599 (Tex.Civ. App.1971). *See also*, Justice Laskin's dissenting opinion in *Rivtow Marine Ltd. v. Washington Iron Works*, 40 D.L.R.3d 530, 548 (Sup. Ct.Can.1973). The test finds strong support in Comment, Oregon Adopts the Degree of Danger Test for Strict Liability—The Implied Warranty Alternative, 58 Or.L.Rev. 545 (1980). [hereinafter referred to as Comment]

The distinction between dangerous and nondangerous products was at the heart of *Fentress v. Van Etta Motors*, 157 Cal. App.2d Supp. 863, 323 P.2d 227 (1958), the case from which the "sudden and calamitous" language was originally drawn. There the court framed the issue as follows:

"Will an action lie against the manufacturer of an article which, if negligently made, *is likely to produce injury to persons or property*, for damages resulting from an accident caused by the negligence, where the damages are confined to the destruction or harm to the article itself?" (emphasis added).

323 P.2d at 228.

We recognized this distinction in *Cloud* and used it as a basis for distinguishing our opinion in *Morrow*. In *Cloud* we said:

"The harm alleged in this case is much different than that alleged by the Morrows in *New Moon*. The Morrow's trailer was allegedly defectively manufactured, but the defects resulted in a deprivation of the value of the Morrow's bargain. Unlike the circumstances of the case at

bar, the Morrows were plagued by a 'lemon,' not an unsafe product."
563 P.2d at 251.[8]

We hold, therefore, that when a defective product creates a situation potentially dangerous to persons or other property,[9] and loss occurs as a result of that danger, strict liability in tort is an appropriate theory of recovery, even though the damage is confined to the product itself. In order to recover on such a theory plaintiff must show (1) that the loss was a proximate result of the dangerous defect [10] and (2) that the loss occurred under the kind of circumstances that made the product a basis for strict liability.[11]

In the present case, appellant alleges that the engine sustained damage as a result of a defective low oil pressure shutdown mechanism which failed to operate properly after an oil leak occurred. As a result of the engine running without sufficient oil, the engine overheated and seized. There is no evidence in the record that such a defect presented a danger to persons or other property and no evidence of violence, fire, collision with external objects, or other calamity as a result of this failure. The engine apparently just stopped operating.[12]

---

**8.** *See* Note, Products Liability: Expanding the Property Damage Exception in Pure Economic Loss Cases, 54 Chi-Kent L.Rev. 963, 965 (1978).

**9.** In *Butaud v. Suburban Marine & Sporting Goods, Inc.*, 543 P.2d 209, 214 (Alaska 1975), we rejected the requirement that the product be "unreasonably dangerous" and held that plaintiff in a strict products liability suit need only prove a defect which is the proximate cause of his injuries. We do not deviate from that position, which has sound basis in both logic and law. *See Cronin v. J.B.E. Olson Corp.*, 8 Cal.3d 121, 104 Cal.Rptr. 433, 442–443, 501 P.2d 1153, 1161–63 (1972). *Butaud,* however, was a case involving personal injuries. In such cases it is unnecessary and an added burden on the plaintiff to require proof of an "unreasonably dangerous" defect. Requiring the plaintiff to show proximate cause assures that the manufacturer's liability will remain within permissible bounds. *Id.* 433 Cal.Rptr. at 443, 501 P.2d at 1162. In the present case, the only harm alleged is damage to the product itself. Liability is, therefore, premised on a danger that did not materialize—that is, the danger that persons or property would be harmed as a result of the defect. In such situations it is entirely appropriate to require plaintiff to show that the product had the potential to cause

harm to persons or other property because such a showing is necessary to bring the case within the traditional boundaries of tort law. *See* note 6 and accompanying text, *supra.*

**10.** This causation requirement directly ties the seller's liability to the seller's breach, marketing an unsafe product. Thus, liability attaches even though the type of loss is different than it might have been, e. g., repair loss instead of personal injury. Correspondingly, if the dangerous defect did not cause the loss, the seller of a dangerously defective product can avoid a strict liability claim. *See* Comment, *supra* note 7 at 552.

**11.** The requirement that the loss occur under dangerous circumstances is necessary because, in our view, allowing recovery solely on proof that a defect *could* endanger persons or property is too speculative. *Id.*

**12.** Appellant's brief argues that "it is certainly not inconceivable that the failure of this mechanism could have caused a fire in the generating plant or otherwise damaged property or injured person." In a deposition George Tillbury, a professional engineer, explained that an engine operating with low oil pressure would

Under the guidelines we have enunciated, appellant's loss is, therefore, entirely economic.

Cases cited by appellant do not persuade us otherwise. To the contrary, these cases support our holding. *John R. Dudley Construction Co. v. Drott Manufacturing Co.*, 412 N.Y.S.2d 512, 66 A.D.2d 368 (1979), involved the sudden collapse of a construction crane which caused serious damage to the crane but no damage to persons or other property. In finding that the resulting injury constituted "property damage" the court distinguished *Santor v. A & M Karagheusian, Inc.*, 44 N.J. 52, 207 A.2d 305 (1965) in the following manner:

> "In *Santor* (unlike the case at bar) there was no physical injury and *it could not be claimed that defendant had committed the tort of marketing a product which contained a defect which made it, when properly used, dangerous to life or limb or property.*" (emphasis added).

412 N.Y.S.2d at 515. Likewise, in *Gherna v. Ford Motor Co.*, 246 Cal.App.2d 639, 55 Cal. Rptr. 94 (1966), the injury—spontaneous conflagration of a car—was also of a type potentially hazardous to persons or other property. In both cases, the criteria we have enunciated would have been met and recovery would have been appropriate. For reasons we have already stated, these cases are not analogous to the case at bar.

---

wear on the bearings, the crankshaft, and cylinder walls. He did not mention that the heat was sufficient to create a fire outside of the engine, or that the engine could explode. The heat merely creates additional internal engine destruction. The claim by appellant's counsel of potential fire resulting in damage to property and persons is too speculative to provide a basis for recovery in strict liability. *See* note 9, *supra* and accompanying text.

Appellant also maintains that the shutoff mechanism created an unreasonable risk of harm to the engine itself. We need not consider this point because our holding assumes the risk of harm is to persons or *other* property. *See Russell v. Ford Motor Co.*, 281 Or. 587, 575 P.2d 1383, 1386 n.5 (1978). To the extent that appellant maintains that the engine and the shutdown mechanism are separate component parts, we reject that contention here. See discussion, Part II, *infra*.

## II

 The only remaining question is whether the low oil pressure shutoff mechanism can be considered a component part which, due to defect, damaged another component part, the engine, so as to result in damage to "other" property of the appellant. While we think this proposition may have some validity where the components are sold separately or are provided by different suppliers,[13] we find no justification or support for such a rule where both components are provided by one supplier as part of a complete and integrated package.[14] Since all but the very simplest of machines have component parts, such a broad holding would require a finding of "property damage" in virtually every case where a product damages itself. Such a holding would eliminate the distinction between warranty and strict products liability.

In this case, Northern Power is suing one manufacturer, Caterpillar, who, according to the findings of the trial court, sold the generator to NC "as a package . . . [not] as individual component parts." We, therefore, reject this contention.

AFFIRMED.

---

13. *See Walker Truck Contractors, Inc. v. Crane Carrier Co.*, 405 F.Supp. 911 (E.D.Tenn.1975) (purchaser of defective trucks sued two different manufacturers of component parts); *Mike Bajalia, Inc. v. Amos Constr. Co.*, 142 Ga.App. 225, 235 S.E.2d 664, 665–66 (1977) (cause of action stated against manufacturer of construction material when defect caused damage to other component material in building).

14. *See Henderson v. General Motors Corp.*, 152 Ga.App. 63, 262 S.E.2d 238 (1979) (automobile's parking gear pin broke causing damage to vehicle's transmission); *Long v. Jim Letts Oldsmobile, Inc.*, 135 Ga.App. 293, 217 S.E.2d 602, 604 (1975) (defective radiator destroyed engine). That the low oil pressure shut-off mechanism was merely an option and not standard equipment on the generator does not change our opinion that it was an integral part of the engine.