Chad CARTER, Plaintiff–Appellant,

v.

**BRIGHTON FORD, INC.,**
Defendant–Appellee.

No. 09CA1966.

Colorado Court of Appeals,
Div. VI.

Sept. 30, 2010.

Wynkoop & Thomas, P.C., Richard B. Wynkoop, Susan G. Thomas, Denver, Colorado, for Plaintiff–Appellant.

Wheeler Trigg O'Donnell, LLP, Christina J. Valerio, Denver, Colorado, for Defendant–Appellee.

Opinion by Judge GRAHAM.

Plaintiff, Chad Carter, who purchased a high performance automobile which proved defective, appeals the summary judgment dismissing his claims against defendant, Brighton Ford, Inc., for breach of implied warranty of merchantability and revocation of acceptance. We reverse and remand.

## I. Background

In April 2007, Carter purchased from Brighton Ford a 2006 Mustang produced pursuant to a joint manufacturing agreement between Ford Motor Company and Saleen Inc. The Mustang contained numerous high performance components which were manufactured or installed by Saleen. The vehicle experienced numerous mechanical defects from the day of purchase, requiring frequent repair visits to Brighton Ford. It was inoperable for a period exceeding thirty days during the first year of ownership.

In October 2007, Carter brought this action, including claims against Brighton Ford for breach of implied warranty of merchantability and revocation of acceptance under the Colorado Uniform Commercial Code, sections 4–2–314 and 4–2–608, C.R.S.2010, respectively, as well as claims against Ford and Saleen for violation of the Colorado Lemon Law, revocation, and breach of express and implied warranties. Ford Motor Company was dismissed after discovery revealed that the mechanical defects in the vehicle were exclusively attributable to modifications performed by Saleen. Saleen ceased operations, leaving Carter with no express warranty on Saleen components. Only Carter's claims against Brighton Ford for revocation and breach of implied warranty remained.

Brighton Ford moved for summary judgment, arguing that Carter's claims were product liability claims and therefore barred by the "innocent seller" statute, section 13–21–402, C.R.S.2010.[1] The trial court agreed and dismissed Carter's remaining claims. This appeal followed.

## II. Standard of Review

Summary judgment is proper if the pleadings and supporting documentation show that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. *McIntire v. Trammell Crow, Inc.,* 172 P.3d 977, 979 (Colo.App. 2007). We review a district court's order granting summary judgment de novo, applying the same principles that guided its determination whether summary judgment was proper. *Soto v. Progressive Mountain Ins. Co.,* 181 P.3d 297, 300 (Colo.App.2007).

We also review de novo questions of statutory interpretation because they involve only questions of law. *Smith v. Exec. Custom Homes, Inc.,* 230 P.3d 1186, 1189 (Colo.2010). Our primary task is to determine and give effect to the intent of the General Assembly. *Id.* When interpreting a statute, we strive to adopt an interpretation that best effectuates the legislative purposes. *Id.* To do so, we interpret statutory terms in accordance with their plain and ordinary meanings, reading the statute as a whole in order to give consistent, harmonious, and sensible effect to all of its parts. *Wolford v. Pinnacol Assurance,* 107 P.3d 947, 951 (Colo.2005). We also presume that the legislature intended a just and reasonable result. § 2–4–201(1)(c), C.R.S. 2010. Therefore, we will not interpret a statute in a manner that leads to an absurd or unreasonable result. *See People v. Riggs,* 87 P.3d 109, 117 (Colo.2004).

In situations where the language of the statute is ambiguous, we are required to consider several factors, including the object of the statute, the circumstances of its enactment, legislative history, the common law or former statutory provisions, the consequences of a particular construction, and the legislative declaration or purpose of the statute. § 2–4–203, C.R.S.2010.

When two statutes address the same subject matter, an appellate court will attempt to reconcile them so as to give effect to each statute. *People v. Campbell,* 885 P.2d 327, 329 (Colo.App.1994); *see also Colo. State Bd. of Med. Exam'rs v. Jorgensen,* 198 Colo. 275, 281, 599 P.2d 869, 873–74 (1979) (repeal of a statute by implication is disfavored and inconsistent statutory provisions should be construed to give harmonious effect to both).

Particular statutes prevail over general statutes and, because statutory repeal by implication is not favored, a general statute will not be interpreted to repeal a conflicting provision, unless the General Assembly clearly expresses its intent to do so. *Uberoi v. Univ. of Colo.,* 686 P.2d 785, 787 (Colo.1984); *City of Colorado Springs v. Bd. of Cnty. Comm'rs,* 895 P.2d 1105, 1118 (Colo.App. 1994).

## III. Analysis

We are called upon to decide whether the trial court erred in ruling that a product liability action may be based upon a claim for breach of an implied warranty of merchantability and a claim for revocation of acceptance where the product was defective and the only damage suffered by the buyer was the economic loss of the product itself. In reviewing the trial court's ruling, we are called upon to interpret the innocent seller statute, section 13–21–402(1), C.R.S.2010, and the meaning of the term "product liability action," which is defined in section 13–21–401(2), C.R.S.2010.

Colorado's "innocent seller" statute provides in pertinent part:

No product liability action shall be commenced or maintained against any seller of a product unless said seller is also the manufacturer of said product or the manufacturer of the part thereof giving rise to the product liability action. *Nothing in this part 4 shall be construed to limit any*

---

1. "Innocent seller" is not entirely accurate nomenclature, because the statute does not require complete innocence on the part of the seller.

For example, the statute appears to apply to a seller fully aware of the product's defect.

*other action from being brought against any seller of a product.*

§ 13–21–402(1) (emphasis added).

Section 13–21–401(2) defines "product liability action" as

any action brought against a manufacturer or seller of a product, *regardless of the substantive legal theory* or theories upon which the action is brought, for or on account of *personal injury, death, or property damage caused* by or *resulting* from the manufacture, construction, design, formula, installation, preparation, assembly, testing, packaging, labeling, or sale of any product, or the failure to warn or protect against a danger or hazard in the use, misuse, or unintended use of any product, or the failure to provide proper instructions for the use of any product.

(Emphasis added.)

### A. Product Liability Actions

The plain language of the innocent seller statute provides that, although product liability actions may not be brought against innocent sellers, "other actions" may be brought. Section 13–21–402(1) prohibits only *product liability actions* against nonmanufacturing sellers, expressly allowing other types of actions to proceed.

It is undisputed that Brighton Ford is a nonmanufacturing seller. Thus, we must determine whether Carter's contract claims against Brighton Ford constitute product liability claims or whether they are to be considered "other actions" which can be maintained against a seller. Stated another way, can contract claims which seek only recovery for economic loss of the defective product constitute product liability claims? We conclude that Carter's contract claims are not based upon product liability.

■ The trial court concluded otherwise, holding that "[u]nder Colorado law, 'breach of express warranty and breach of implied warranty claims are based on product liability.' " In doing so, the trial court relied upon a federal district court opinion, *Loughridge v. Goodyear Tire & Rubber Co.,* 207 F.Supp.2d 1187 (D.Colo.2002). In *Loughridge,* a manufacturer of hydronic radiant heating hoses

was sued after customers complained that their homes and driveways were damaged by leaks from the hoses. There, the court was called upon to determine whether Colorado's comparative fault statute, section 13–21–111.5, C.R.S.2010, applied to product liability claims. *Loughridge,* 207 F.Supp.2d at 1190. In concluding that comparative fault applied to product liability claims, the court relied upon section 13–21–406(1), C.R.S.2010, which provides, in part, that "[i]n any product liability action, the fault of the person suffering the harm, as well as the fault of all others who are parties to the action for causing the harm, shall be compared by the trier of fact." *Id.* at 1191. Without analyzing the basis of the claims, the court reasoned that even the designated contract claims were "product liability claims" under the definition of section 13–21–401(2). *Id.* The court did not interpret the term "property damage" as used in section 13–21–401(2) and was not confronted with the issue we now resolve: namely, whether a warranty claim for a defective product without collateral damage or risk of harm constitutes a product liability action. We note that we are not bound by the decisions of lower federal courts. *Hill v. Thomas,* 973 P.2d 1246, 1255 (Colo.1999), *aff'd,* 530 U.S. 703, 120 S.Ct. 2480, 147 L.Ed.2d 597 (2000). Unlike the trial court, we reject the reasoning of *Loughridge* that all warranty claims are necessarily product liability claims.

■ In determining the breadth and depth of a "product liability action," we look to the history of product liability as a strict liability tort and the resulting blur of the distinction between tort law and contract law. We conclude that contract claims which seek only economic loss for a defective product without collateral damage or risk of harm to others do not constitute product liability actions.

Brighton Ford argues that the term "product liability actions" includes theories of liability based upon either tort or contract and asserts that *Hiigel v. General Motors Corp.,* 190 Colo. 57, 544 P.2d 983 (1975), is dispositive because it approved a product liability action that sought only economic loss for damage to the defective product itself. Reading *Hiigel* in light of *Town of Alma v.*

*AZCO Construction, Inc.*, 10 P.3d 1256 (Colo. 2000), we conclude that *Hiigel* has been substantially narrowed and clarified.

Against the backdrop of *Town of Alma, Hiigel* can be distinguished because it involved the manufacturer's failure to warn of an inherent danger in the product. In *Hiigel*, there was property damage to the product (in addition to the defect), coupled with a danger of harm to others. Indeed, *Hiigel* adopted the Restatement (Second) of Torts section 402A, which ascribes strict liability to the seller of "any product in a defective condition unreasonably dangerous to the user or consumer or to his property." *Hiigel*, 190 Colo. at 63, 544 P.2d at 987. In addition, the court in *Hiigel* concluded that the failure to warn can render a product, otherwise free of defect, defective. *Id.* Thus, to the extent that a product liability action may be available where the damage is only to the product itself, it appears that *Hiigel* would limit the action to situations where there was a failure to warn that the defect could cause injury or damage.

In *Hiigel*, wheel studs that had not been tightened to proper torque specifications sheared off and caused dual rear wheels to separate from a vehicle during operation. *Id.* at 60–61, 544 P.2d at 985–86. The court concluded that the product was unreasonably dangerous and noted that comment j to Restatement section 402A states, "In order to prevent the product from being unreasonably dangerous, the seller may be required to give directions or warning...." *Id.* at 63, 544 P.2d at 987.

Three justices dissented, agreeing with the adoption of section 402A of the Restatement but disagreeing with the majority's "extension of the doctrine of strict liability to allow recovery for damages resulting to the property which is the subject of the sale." *Id.* at 66–67, 544 P.2d at 990 (Lee, J., dissenting). The dissent further disagreed with the majority's reliance on *Santor v. A & M Karagheusian, Inc.*, 44 N.J. 52, 207 A.2d 305 (1965), *abrogated by Alloway v. Gen. Marine Indus., L.P.*, 149 N.J. 620, 695 A.2d 264 (1997), a case where mere economic loss to the product itself justified a product liability claim. *Id.* at 67, 544 P.2d at 990. Instead,

the dissent relied upon *Seely v. White Motor Co.*, 63 Cal.2d 9, 45 Cal.Rptr. 17, 403 P.2d 145 (1965). *Id.* In *Seely*, the court noted:

> The distinction that the law has drawn between tort recovery for physical injuries and warranty recovery for economic loss is not arbitrary and does not rest on the "luck" of one plaintiff in having an accident causing physical injury. The distinction rests, rather, on an understanding of the nature of the responsibility a manufacturer must undertake in distributing his products.

*Seely*, 45 Cal.Rptr. 17, 403 P.2d at 151.

Subsequent to *Hiigel*, the United States Supreme Court decided *East River Steamship Corp. v. Transamerica Delaval, Inc.*, 476 U.S. 858, 106 S.Ct. 2295, 90 L.Ed.2d 865 (1986). There, the Court was faced with the question of whether a claim based on a theory of product liability could be maintained where the damage caused by the defect was confined to the product itself and did not represent a danger or risk. Although the case was in admiralty, the Court's analysis is applicable to the case before us and has been cited with approval by our own supreme court. *See Town of Alma*, 10 P.3d at 1261.

*East River* reasoned that the concepts of warranty and product liability dealt with two separate theories of harm. Where a defective product results in only damage to the product, the loss is purely economic and is not the kind of harm that public policy requires manufacturers to protect against, absent a contractual obligation to do so. *East River*, 476 U.S. at 866–71, 106 S.Ct. 2295. Citing *Seely*, the Court observed: "When a product injures only itself the reasons for imposing a tort duty are weak and those for leaving the party to its contractual remedies are strong." *Id.* at 871, 106 S.Ct. 2295. The Court specifically declined to adopt the reasoning of *Santor*, which had been relied upon in *Hiigel*:

> Damage to a product itself is most naturally understood as a warranty claim. Such damage means simply that the product has not met the customer's expectations, or, in other words, that the customer has received "insufficient product value."

*See* J. White and R. Summers, *Uniform Commercial Code* 406 (2d ed.1980). The maintenance of product value and quality is precisely the purpose of express and implied warranties. *See* UCC § 2–313 (express warranty), § 2–314 (implied warranty of merchantability), and § 2–315 (warranty of fitness for a particular purpose). Therefore, a claim of a nonworking product can be brought as a breach-of-warranty action. Or, if the customer prefers, it can reject the product or revoke its acceptance and sue for breach of contract. *See* UCC §§ 2–601, 2–608, 2–612.

*Id.* at 872, 106 S.Ct. 2295 (footnote omitted). The Court noted that the basis for product liability was a public policy that required manufacturers to protect against products that presented unreasonable dangers to users:

Products liability grew out of a public policy judgment that people need more protection from dangerous products than is afforded by the law of warranty. *See Seely v. White Motor Co.,* 63 Cal.2d 9, 15, 45 Cal.Rptr. 17, 21, 403 P.2d 145, 149 (1965). It is clear, however, that if this development were allowed to progress too far, contract law would drown in a sea of tort. *See* G. Gilmore, *The Death of Contract* 87–94 (1974). We must determine whether a commercial product injuring itself is the kind of harm against which public policy requires manufacturers to protect, independent of any contractual obligation.

. . . .

The paradigmatic products-liability action is one where a product "reasonably certain to place life and limb in peril," distributed without reinspection, causes bodily injury. The manufacturer is liable whether or not it is negligent because "public policy demands that responsibility be fixed wherever it will most effectively reduce the hazards to life and health inherent in defective products that reach the market."

*Id.* at 866–67, 106 S.Ct. 2295 (additional citations omitted) (quoting *Escola v. Coca Cola Bottling Co.,* 24 Cal.2d 453, 150 P.2d 436, 441 (1944) (Traynor, J., concurring)). In contrast, damages occurring only to the product itself represent the type of damages that can be foreseen and dealt with by contract. A conclusion that such damage satisfies the type of property damage contemplated by products liability "would eliminate the distinction between warranty and strict products liability." *Id.* at 867, 106 S.Ct. 2295 (quoting *N. Power & Eng'g Corp. v. Caterpillar Tractor Co.,* 623 P.2d 324, 330 (Alaska 1981)). "Damage to a product itself is most naturally understood as a warranty claim. Such damage means simply that the product has not met the customer's expectations...." *Id.* at 872, 106 S.Ct. 2295; *see also Trans States Airlines v. Pratt & Whitney Canada, Inc.,* 177 Ill.2d 21, 224 Ill.Dec. 484, 682 N.E.2d 45, 52 (1997) (following *East River* and *Seely;* distinguishing product liability cases on the basis of the nature of the defect and the manner in which the injury occurred: "Losses resulting from damage to the product itself caused by the product's failure to function properly can be recovered only through an action for breach of warranty.").

### B.  Economic Loss Rule

In 2000, the Colorado Supreme Court revisited the principles involved in the distinction between contract and tort law. *See Town of Alma,* 10 P.3d at 1259. There, the court took the opportunity "to address the status of the economic loss rule in Colorado" and examined the development of the rule in other jurisdictions and the principles underlying the rule. *Id.*

The court looked to the origins of the economic loss rule and observed that the "rule is intended to maintain the boundary between contract law and tort law." *Id.* The court also observed that the economic loss rule had been adopted to limit the use of tort theories that had become the basis for asserting liability in product liability cases. *Id.* Citing both *East River* and *Seely,* the court recognized that "[a]fter paving the road to allow tort theories to proceed in products liability cases, the California Supreme Court in *Seely* ... was the first to adopt the economic loss rule and to recognize the importance of limiting the use of tort theories." *Id.* at 1260, 1261. The court distinguished *Hiigel* by stating that the case "endorsed the

principles underlying the economic loss rule when we declined to extend Section 402A's strict liability doctrine to allow it to be used as a vehicle to recover commercial or business losses."[2] *Id.* at 1261. However, the court went on to adopt the analyses employed in both *East River* and *Seely*[3]: "When a product injures only itself the reasons for imposing a tort duty are weak and those for leaving a party to its contractual remedies are strong.... Losses like these can be insured [through warranties]...." *Id.* (quoting *East River,* 476 U.S. at 871–72, 106 S.Ct. 2295). In fashioning a rule based upon the nature of the duty owed, the court held that "[a] breach of duty which arises under the provisions of a contract between the parties must be redressed under contract, and a tort action will not lie." *Id.* at 1262 (quoting *Tommy L. Griffin Plumbing & Heating Co. v. Jordan, Jones & Goulding, Inc.,* 320 S.C. 49, 463 S.E.2d 85, 88 (1995)). The duties of the parties mark the difference between tort and contract obligations. *Id.* Tort obligations arise from duties imposed by laws that are designed to protect consumers from the risk of harm, irrespective of contractual arrangements. *Id.* "In contrast, contract obligations arise from promises made between the parties. Contract law is intended to enforce the expectancy interests created by the parties' promises so that they can allocate risks and costs during their bargaining." *Id.* The court's rule looks to the source and type of the duty owed to determine the availability of a contract or tort action:

> The question, thus, is not whether the damages are physical or economic. Rather the question of whether the plaintiff may maintain an action in tort for purely economic loss turns on the determination of the source of the duty [the] plaintiff claims the defendant owed. A breach of a duty which arises under the provisions of a contract between the parties must be redressed under contract, and a tort action will not lie. A breach of a duty *arising*

*independently* of any contract duties between the parties, however, may support a tort action.

*Id.* (quoting *Tommy L. Griffin,* 463 S.E.2d at 88).

### C. Scope of Product Liability Actions

Having traced the origin and evolution of the economic loss rule and our own supreme court's development of that rule into an independent duty rule, we now turn to our task of interpreting the innocent seller statute and determining whether pure contract claims can be designated as product liability claims or whether by fashioning the innocent seller statute, the General Assembly intended to insulate the nonmanufacturing seller from any liability associated with defective products that cause no collateral damage but are simply inoperable or unacceptable.

*Town of Alma* did not directly address whether a claim solely for economic loss nevertheless constitutes a product liability action.

### D. The Innocent Seller

Against the background of *East River* and *Town of Alma,* we address the seeming inconsistency between the mandate in the innocent seller statute that "no product liability action shall be commenced or maintained against any [nonmanufacturing] seller of a product" and the proviso that "nothing in this part 4 shall be construed to limit any other action from being brought against the seller of a product." § 13–21–402(1). Because "product liability action" means "any action" against the seller "regardless of the substantive legal theory" upon which the action is based, § 13–21–401(2), does this include actions based upon warranty for products that are defective? The Colorado Uniform Commercial Code plainly permits actions by a buyer against the seller. For example, section 4–2–313, C.R.S.2010, establishes express warranties by affirmation, promise, or de-

---

**2.** We are aware that some jurisdictions distinguish between commercial transactions and consumer transactions. We are unable to see that such distinction makes any difference when the product damages only itself.

**3.** *East River* rejected the ruling in *Santor,* to the effect that a defect in carpeting was enough to support a product liability claim. *East River,* 476 U.S. at 870, 106 S.Ct. 2295. *Santor* was specifically relied upon in *Hiigel. See Hiigel,* 190 Colo. at 64, 544 P.2d at 989.

scription and specifies how such warranties are created by the seller. Section 4–2–314, C.R.S.2010, provides that goods shall be merchantable by implication in contracts for sale unless such warranty is expressly excluded. Also, section 4–2–608, C.R.S.2010, permits revocation of acceptance by the buyer where goods do not conform and their value has been substantially impaired. Whether claims under these particular provisions are barred in the instant case is problematic.

The modifications to the innocent seller statute, section 13–21–402, were introduced as Senate Bill 03–231 in February 2003. Ch. 167, sec. 1, 2003 Colo. Sess. Laws 1289. That bill struck from an earlier version of the statute the clause "based on the doctrine of strict liability in tort," which had previously modified "product liability action." The bill also struck the clause "which is alleged to contain or possess a defective condition unreasonably dangerous to the buyer, user, or consumer." That clause had modified "product" in the earlier version of section 13–21–401. Thus, it appears that the bill created a much broader and general statute from the previous more specific statute. Where a product liability action based upon the doctrine of strict liability in tort and alleging an unreasonably dangerous condition (like the action in *Hiigel*) could not be brought against an innocent seller prior to Senate Bill 03–231, the new version of the statute would bar *any* action, whether or not the action was based upon strict liability in tort and whether or not the action alleged that the product was unreasonably dangerous. The testimony before the Senate and the House Committees supports this interpretation. *See* Hearings on S.B. 03–231 before the S. Judiciary Comm., 64th Gen. Assemb., 1st Sess. (Feb. 12, 2003); Hearings on S.B. 03–231 before the H. Comm. on Business Affairs & Labor, 64th Gen. Assemb., 1st Sess. (Mar. 27, 2003). A sponsor of the bill stated that the existing law's protections for innocent sellers only applied to suits based on strict tort liability. In addition, the sponsor stated that plaintiffs often sue a local seller along with the manufacturer of a defective product in order to defeat removal to federal court.

An attorney testifying in support of the bill stated that the amendment would protect sellers against claims based on theories of negligence, breach of implied warranty, "and the like." Attorney Lee Mickus testified that the modification would "[c]reat[e] a great ambiguity as to whether or not ... other types of claims—warranty and negligence—remain under Colorado law." Attorney Ross Buchanan predicted that "[a] court will look at this and say well the definition suggests you can have a claim against a seller, and yet this provision seems to say you can't."

We agree that an ambiguity was created by the modification on the one hand, and the General Assembly's decision on the other hand to keep intact the provision that "nothing in this part 4 shall be construed to limit any other action from being brought against any seller of a product." If we were to read the statute as barring any and all claims against the seller of a product (a reading which has some support in the legislative history), it would appear that the General Assembly had repealed certain provisions of the Colorado Uniform Commercial Code without expressing an intent to do so.

Reading the statute to be a general bar of any claim based on strict liability, negligence, contract, or warranty would suggest that a seller of a product that does not work cannot be sued even if he gives an express warranty of merchantability. Under such a reading, if, for example, a buyer purchases a power lawn mower with the express understanding that he can return it if it does not satisfactorily cut grass, he could not force the seller to exchange the mower or return the buyer's money when the motor stops working on the first day of ownership.

Furthermore, the last sentence of the statute providing that the statutory provisions should not be "construed to limit any other action from being brought against the seller" would become meaningless if we were to read section 13–21–402(1) to bar any product liability action and the idea of "property damage" in the definition of section 13–21–401(2) so broadly as to include even actions that seek to return products that simply do not work. Such a broad reading of the concept of property damage and product liability would insulate all sellers from buyers dissat-

isfied because a stapler will not staple, a lawn mower will not mow, or a coffee maker will not brew. We are disinclined to read such legislative intent into the innocent seller statute. Instead, we conclude that the General Assembly intended to insulate sellers who did not manufacture a product from liability for harm caused by the product and not from the commercial obligation to stand behind the merchantability of a product the seller chooses to sell in the public market place.

■ In light of the reasoning behind the economic loss rule, as explained by *Town of Alma,* and in light of what we perceive to be ambiguity in the statute, product liability actions are those tort actions which seek damages for injuries and collateral damage caused by defective products. Contractual claims for economic loss to the product only do not constitute "product liability actions."

■ The Restatement (Third) of Torts: Products Liability section 21 (1998) states that damage to the product itself should not be recoverable under a product liability theory. However, when the defect in the product renders it unreasonably dangerous, as was the case in *Hiigel,* a product liability action may lie. Comment d to the Restatement (Third) of Torts section 21 states:

> *Harm to the defective product itself.* When a product defect results in harm to the product itself, the law governing commercial transactions sets forth a comprehensive scheme governing the rights of the buyer and seller.... A somewhat more difficult question is presented when the defect in the product renders it unreasonably dangerous.... In these situations the danger ... eventuates in harm to the product itself but not in harm to persons or other property. A plausible argument can be made that products that are dangerous, rather than merely ineffectual, should be governed by the rules governing products liability law.

This view comports with the reasoning of *East River* and the economic loss rule of *Town of Alma.* The distinction between a functional defect that affects the worth of the product and a defect that renders the product unreasonably dangerous is found elsewhere in Colorado products liability law. In *Anderson v. M.W. Kellogg Co.,* 766 P.2d 637 (Colo.1988), the Colorado Supreme Court recognized such a distinction with respect to an earlier version of section 13–80–107, C.R.S.2010, "Limitations of actions against manufacturers, sellers, or lessors of new manufacturing equipment," for product liability actions based on hidden defects causing "personal injury, death, or property damage." The court determined that the term "defect" under the statute does not mean a mere mechanical or functional defect but is anything that makes the product "unreasonably dangerous." *Anderson,* 766 P.2d at 643.

■ This interpretation is supported by *Town of Alma*'s duty analysis. A product that is defective because it fails in its essential purpose implicates a buyer's reasonable expectations and the promise of the seller to sell a merchantable product. It does not implicate a duty to protect the buyer against unreasonable risk of harm. When we analyze the duties of the parties in light of Carter's claims, we conclude that his claims are based entirely in contract. His claim for breach of warranty of merchantability is based upon his inability to use the Mustang and not on any allegation that the car poses a danger to him. Also, his claim for revocation of acceptance seeks to dissolve the contract and to fulfill his expectations as an automobile buyer. Nothing in his complaint implicates a duty to protect him against unreasonable risk.

Therefore, we conclude that Carter's claims for revocation of acceptance and breach of implied warranty of merchantability are based upon mechanical defects that defeat the benefit of his bargain—not defects making the product unreasonably dangerous. Consequently, they are not product liability claims and, accordingly, are not barred by the "innocent seller" statute.

The judgment is reversed, and the case is remanded with directions to reinstate Carter's claims for breach of implied warranty of merchantability and for revocation of acceptance.

Judge LOEB and Judge MILLER concur.